**Jerome K. DUNCAN, Plaintiff and Appellee,**

v.

**Eileen M. HOWARD; Sandra Thorderson; Larry Thorderson; and State of Utah, Department of Human Services, Defendants and Appellants.**

No. 950227–CA.

Court of Appeals of Utah.

June 13, 1996.

Leslie W. Slaugh, Provo, for Appellant Howard.

John Spencer Snow, Salt Lake City, for Appellants Thorderson.

Wendy M. Lewis, Salt Lake City, for Appellee.

Before ORME, BENCH and WILKINS, JJ.

## OPINION

WILKINS, Judge:

Eileen M. Howard and Sandra and Larry Thorderson appeal an order of the district court granting custody of Clel Howard to Jerome K. Duncan. We affirm.

## BACKGROUND

Mr. Duncan and Ms. Howard met in 1987. In the fall of that year, they began cohabiting

in Cedar City, Utah. They lived together for four or five months, until Mr. Duncan moved to Texas to seek other employment, and he and Ms. Howard ended their relationship. Clel was born to Ms. Howard on October 12, 1988. At that time, Ms. Howard was living with her mother and stepfather, Sandra and Larry Thorderson, in Salt Lake City, Utah. Ms. Howard cared for Clel, with Ms. Thorderson's assistance, for about nine months. After about nine months, Ms. Howard obtained employment and left Clel in Ms. Thorderson's care.

Mr. Duncan was notified of Clel's birth by a letter from Ms. Howard in January 1989. A few days after he received this letter, Mr. Duncan left his job in Texas and moved back to Utah. He resided near the Thordersons' residence, where Clel and Ms. Howard lived. Mr. Duncan began visiting Clel when his work schedule, the Thordersons' schedules, and Clel's schedule permitted. Mr. Duncan testified he visited Clel about three times a month. Mr. Duncan also testified he paid child support to Ms. Howard for Clel, and presented into evidence photocopies of money order receipts made out to Ms. Howard totaling approximately $5400. The Thordersons deny these payments were made. Mr. Duncan filed an acknowledgment of paternity with the Department of Social Services in December 1989.

Following some difficulty with visitation, Mr. Duncan filed a paternity action in Utah in September 1991. In December 1991, Ms. Howard filed a motion to determine whether Mr. Duncan was Clel's father. Subsequently, Ms. Howard received blood test results and agreed that Mr. Duncan was Clel's natural father.

The Thordersons and Ms. Howard moved to Pennsylvania with Clel in April 1992. In May 1992, the Utah court issued a temporary visitation order giving Mr. Duncan the right to have Clel come to Utah for a visit. Pursuant to this order, Ms. Howard traveled with Clel to Utah twice during the summer of 1992 to allow Mr. Duncan to visit with Clel. Mr. Duncan testified he paid for both Ms. Howard and Clel's airfare for those visits. During the second visit, in September 1992, Ms. Howard decided to stay in Utah with

Clel. In that same month, the court issued a temporary visitation order, pursuant to the parties' stipulation, which governed Mr. Duncan's visitation schedule with Clel. Mr. Duncan testified that Clel regularly visited him during this time, both during the week and on weekends. Clel would stay overnight with him at least once a week. However, in November 1992, just before Thanksgiving, Ms. Howard sent Clel back to Pennsylvania to spend the holidays with the Thordersons.

The Thordersons testified they noticed troubling changes in Clel when he returned to Pennsylvania in November 1992. They began taking Clel to a therapist in Pennsylvania, who diagnosed Clel with behavioral problems and symptoms of emotional disturbance. In December 1992, the Thordersons filed in Pennsylvania a petition for custody of Clel, which was granted. Ms. Howard, however, continued to live in Utah until June 1994, when she returned to Pennsylvania to live with the Thordersons.

In February 1993, Mr. Duncan filed in Utah a Motion for Order to Show Cause, asking either for temporary custody of Clel or for Ms. Howard to return Clel to Utah so that Mr. Duncan could resume his stipulated visitation with Clel. The Pennsylvania court held a telephone conference in April 1993 with the Utah court, resulting in an order entered in May 1993, which declared Utah would retain jurisdiction over the matter of Clel's custody. Ms. Thorderson was then joined as a party to this action in May 1993. During this time, in March 1993, Mr. Duncan married his present wife, Diane.

In June 1993, a hearing was held on Mr. Duncan's Order to Show Cause. In August 1993, the court held that Clel would remain with the Thordersons during the pendency of the action but that he would travel to Utah for a one-month visitation period. The Duncans traveled to Pennsylvania to take Clel back to Utah for the one-month visitation. Although the Thordersons initially did not allow Clel to leave with the Duncans, eventually, after going to court in Pennsylvania, the Duncans were able to transport Clel back to Utah for the visitation period.

During his one-month stay in Utah, a custody evaluation was performed on the natural parents, pursuant to the court's August 1993 order. The court also issued an order in December 1993 granting a motion for an independent custody evaluation of Ms. Thorderson. Also in December 1993, Mr. Thorderson was joined as a party to this action.

In January 1994, Mr. Duncan filed a Motion for Temporary Relief, seeking either temporary custody of Clel or a two-month visit from Clel in Utah. In March 1994, the court ordered that Mr. Duncan continue to enjoy the visitation rights previously granted to him by the court. Mr. Duncan filed another Motion for Temporary Relief in July 1994, seeking a one-month visit from Clel. The court then issued an order that Clel visit Mr. Duncan in Utah that summer. This order was complied with.

A three-day trial was held in September 1994. After hearing the testimony of numerous witnesses, including therapists, the parties, and some of the parties' family members, the trial court applied the parental presumption test set forth in *Hutchison v. Hutchison*, 649 P.2d 38 (Utah 1982), and granted Mr. Duncan custody of Clel in February 1995. Ms. Howard and the Thordersons filed a Motion for Reconsideration, which the trial court denied. In compliance with the court's order, Clel was transferred into the Duncans' custody in June 1995. The court entered yet another order regarding visitation in October 1995. This order indicates that Ms. Howard and the Thordersons have returned to live in Utah and grants Ms. Howard and the Thordersons regular visitation with Clel.

The Thordersons and Ms. Howard each appealed the trial court's June 1995 Paternity Order and Findings and Conclusions. We consolidated their appeals for argument and decision.

## ISSUES AND STANDARD OF REVIEW

The Thordersons argue that the parental presumption does not apply to this case and that Mr. Duncan's parental presumption was rebutted at trial. They also argue the trial

court erred in denying their Motion for Reconsideration. Ms. Howard joins the Thordersons in appealing these issues. In addition, she argues the trial court erred by not adequately considering the possibility of a contingency custody arrangement by which she would be awarded custody of Clel if she lived with the Thordersons.

 Trial courts have broad discretion in child custody cases. *Linam v. King,* 804 P.2d 1235, 1237 (Utah App.1991). Therefore, "[w]e will not disturb a trial court's custody determination if it is consistent with the standards set by appellate courts and supported by adequate findings of fact and conclusions of law." *Roberts v. Roberts,* 835 P.2d 193, 195–96 (Utah App.1992). However, we will set aside findings of fact that are clearly erroneous. *Linam,* 804 P.2d at 1238. A party challenging a trial court's findings of fact must "marshal all the evidence supporting the trial court's findings and then ... show the evidence to be legally insufficient to support the findings." *Rudman v. Rudman,* 812 P.2d 73, 79 (Utah App.1991).

## ANALYSIS

### The Parental Presumption

Much attention was given in this case to whether the Thordersons or Mr. Duncan would be able to provide the parenting and support needed by Clel, a child who has been in therapy due to emotional problems. Several evaluations were performed by experts. All but one of the experts—the expert appointed by the court—testified that, due to Clel's condition, he should remain with the Thordersons. These experts stated Clel has essentially lived all his life with the Thordersons and that he regards the Thordersons as his parents. A few of these experts even stated that removing Clel from the Thordersons would have devastating consequences and would cause lamentable and irreversible traumatic results for Clel.

 However, Mr. Duncan, as Clel's father, enjoys the parental presumption. Under this presumption, when confronted with custody disputes between parents and nonparents, Utah courts presume it is in the child's best interest—in this case, Clel's best

interest—to be in the custody of his parent. *Hutchison v. Hutchison,* 649 P.2d 38, 40 (Utah 1982).

> This presumption recognizes "the natural right and authority of the parent to the child's custody. . . ." *State in re Jennings,* 20 Utah 2d 50, 52, 432 P.2d 879, 880 (1967). It is rooted in the common experience of mankind, which teaches that parent and child normally share a strong attachment or bond for each other, that a natural parent will normally sacrifice personal interest and welfare for the child's benefit, and that a natural parent is normally more sympathetic and understanding and better able to win the confidence and love of the child than anyone else.

*Id.* This presumption always applies in favor of parents, even where, as in this case, the grandparents seek custody of the child.

The Thordersons and Ms. Howard argue the parental presumption does not apply in this case. However, each of the cases they cite in support of their argument can be distinguished from this case, and none of them revoke the parental presumption standard articulated in *Hutchison.* For example, although *Tuckey v. Tuckey,* 649 P.2d 88 (Utah 1982), also involves a child custody dispute between the natural parent and the grandparents, the court reiterated the parental presumption test set forth in *Hutchison.* The court remarked that natural affection generally exists between grandparents and grandchildren, but the court did not change the *Hutchison* rule. *Id.* at 90.

*Kishpaugh v. Kishpaugh,* 745 P.2d 1248 (Utah 1987) (plurality opinion), also is factually similar to the instant case. In *Kishpaugh,* the natural father appealed an order granting custody of his children to their maternal grandparents, and the Utah Supreme Court affirmed. Unlike the present case, the trial court in *Kishpaugh* found the parental presumption had been rebutted. *Id.* at 1250. Thus, the standard of review worked against the natural father and in favor of the maternal grandparents, unlike this case.

■ The Thordersons and Ms. Howard also both argue that our recent decision of *State ex rel. H.R.V.,* 906 P.2d 913 (Utah App.1995), supports their position. However-

er, although *H.R.V.* also involved a natural parent and another relative who served as the child's parental figure, we held the parental presumption did not apply in that case because the natural father had previously lost his right to assert the presumption. *Id.* at 917. The juvenile court had previously found the children to be neglected under statutory law and deprived the natural parents of custody and guardianship of the children. *Id.* at 914. This court held that once lost, the parental presumption could not be "reassert[ed] . . . at a later date unless custody has since been restored to the parent." *Id.* at 917. The instant case differs from *H.R.V.* Here, Mr. Duncan has never lost the parental presumption through a finding of neglect or other unfitness which could subject him to termination of his parental rights. It is true that Mr. Duncan has never had legal custody of Clel; however, he has never lost his right to assert the presumption due to an adjudication of any lack of fitness as a parent. Therefore, he still benefits from the parental presumption unless the Thordersons and Ms. Howard successfully rebut it.

Therefore, only *after* this presumption is appropriately rebutted can the Thordersons, who are not Clel's parents, successfully show that it would be otherwise in Clel's best interest to remain in their custody. *See Hutchison,* 649 P.2d at 41.

> [The parental presumption] cannot be rebutted merely by demonstrating that the opposing party possesses superior qualifications, has established a deeper bond with the child, or is able to provide more desirable circumstances. If the presumption could be rebutted merely by evidence that a nonparent would be a superior custodian, the parent's natural right to custody could be rendered illusory and with it the child's natural right to be reared, where possible, by his or her natural parent.

*Id.*

■ Instead, the only way to rebut the parental presumption is to present "evidence establishing that a particular parent at a particular time generally lacks all three of the characteristics that give rise to the presumption." *Id.* Therefore, the Thordersons

need to show: (1) that no strong mutual bond exists between Mr. Duncan and Clel, (2) that Mr. Duncan has not demonstrated a willingness to sacrifice his own interest and welfare for Clel's, and (3) that Mr. Duncan lacks the sympathy for and understanding of Clel that is characteristic of parents generally. *See id.* Until the Thordersons presented evidence that rebutted the parental presumption, the trial court had to presume it was in Clel's best interest to live with Mr. Duncan, his natural father. Only *after* the court concluded Mr. Duncan's relationship with Clel generally lacked the three characteristics forming the basis of the parental presumption could the Thordersons compete on equal ground with Mr. Duncan and have the court consider the expert testimony in terms of whether they or Mr. Duncan would better meet Clel's needs. *See id.*

The trial court made specific findings on each of the three characteristics underlying the parental presumption. The court found:

13. . . . [Clel's] bonding to [Mr. Duncan] has been hampered because [Mr. Duncan] has not had the opportunity to develop the bonding relationship with [Clel]. The review of the file and the transcript of these proceedings evidences the resistance [Mr. Duncan] has met in establishing a close relationship with Clel. The testimony of the custody evaluators in this case led the Court to believe that with continued therapy sessions, Clel can develop a strong bond with his father.

. . . .

16. [Mr. Duncan] has demonstrated a willingness to sacrifice his own interest and welfare for [Clel's]. It is evident that [Mr. Duncan] cared about Clel and is willing to sacrifice his own interests for [Clel's][;] however, the [Thordersons] were not cooperative and did not further a father/son relationship between Clel and [Mr. Duncan].

17. There was no significant evidence that [Mr. Duncan] lacked the sympathy for and understanding of the child that is characteristic of parents generally. The Court believes that [Mr. Duncan] understands the problems that have been created by Clel being born out of wedlock, the

abandonment of Clel by his mother, and the lack of regular visitation by him with Clel.

The Thordersons repeatedly refer to the testimony of experts who testified of the devastating consequences of removing Clel from their custody. They argue Mr. Duncan lacks these three characteristics and then, in detail, illustrate how they themselves possess these three characteristics that give rise to the parental presumption. The Thordersons also argue in detail that it is not in Clel's best interest to remove him from their care and place him in Mr. Duncan's care, relying on various factors considered by Utah courts in making custody decisions when the parental presumption is not an issue. However, as stated above, the trial court and this court cannot consider anything beyond the three characteristics giving rise to the parental presumption until that presumption has been rebutted or otherwise lost. *See id.* The presumption is that it is in Clel's best interests to be with his parent.

■ Despite the Thordersons' detailed arguments, we hold, after a careful review of the record, that the Thordersons have failed to show the trial court's findings were clearly erroneous. Admittedly, the trial court did not find that a strong mutual bond exists between Mr. Duncan and Clel. However, testimony given at trial supports the court's findings that a strong bond could develop between Mr. Duncan and Clel, and in fact, suggests that some bonding already exists. In any event, even if one of the three characteristics underlying the parental presumption has been rebutted, the other two clearly have not been rebutted. The Thordersons had to show that all three characteristics were generally lacking in order to adequately rebut the parental presumption. *See id.*

■ The Thordersons argue Mr. Duncan has not sacrificed his welfare for Clel's. They argue that Mr. Duncan has not provided financial support to them; however, at trial Mr. Duncan presented photocopies of money order receipts amounting to approximately $5400 made out to Ms. Howard, suggesting he did provide child support to the child's then-custodial parent. That Ms.

Howard may have failed to pass such funds on to the Thordersons during periods when they had the actual care of Clel does not undercut the importance of Mr. Duncan's financial sacrifice, which is all the more significant because the bulk of the support paid was voluntary rather than court-ordered. The Thordersons argue that Mr. Duncan has had a sporadic relationship with Clel and that he has not cooperated with them with regard to visitation. However, the number of times Mr. Duncan has sought assistance from the court to enjoy his visitation rights with Clel suggests, as the trial court intimated in its findings, that the Thordersons are at least partly to blame for the sporadic relationship Mr. Duncan has had with Clel and his alleged lack of cooperation with them regarding visitation. In addition, the Thordersons repeatedly argue that Mr. Duncan does not recognize Clel's special problems and needs. However, Mr. Duncan's testimony at trial suggests that he does recognize Clel's problems and has sought assistance from therapists to meet Clel's needs. In addition, other information contained in the record evidences the sacrifices Mr. Duncan has made for his relationship with Clel. Mr. Duncan immediately left his job in Texas and moved to Utah upon learning of Clel's birth. He has visited Clel when able, and been involved in extensive litigation seeking visitation rights and then custody of Clel. He paid for Ms. Howard and Clel's airfare to Utah when they visited, even though Mr. Duncan has limited funds. He registered his paternity and underwent blood tests voluntarily to establish his paternity to Clel, even though he knew this would make him legally financially responsible for Clel. The evidence supports the trial court's finding that Mr. Duncan is willing to sacrifice his own interest and welfare for Clel.

■ Finally, the Thordersons argue that Mr. Duncan lacks the sympathy and understanding for Clel that is characteristic of parents generally. They argue that Mr. Duncan has not taken any parenting classes, that he does not have long-term experience raising children, and that he has not provided Clel with the extensive therapy they think he needs. However, these arguments do not show that the trial court's finding that Mr.

Duncan has parental sympathy and understanding for Clel is clearly erroneous. Taking parenting classes, possessing child-raising experience, and perhaps even providing Clel with extensive therapy, may be desirable; however, they are not necessary prerequisites for him to have general parental sympathy and understanding for Clel. In addition, witnesses at trial testified of Mr. Duncan's parenting efforts and obvious feelings of affection toward Clel.

Accordingly, the Thordersons have failed to show Mr. Duncan generally lacks the three characteristics that give rise to the parental presumption. *See Kishpaugh,* 745 P.2d at 1252 (emphasizing that to rebut parental presumption, party must show a *general* lack of all three characteristics). Because the Thordersons have failed to show that any of these findings were clearly erroneous, we affirm the trial court's conclusion that the parental presumption was not rebutted.

### Contingent Custody Plan

■ Ms. Howard argues that "[t]he trial court refused to even consider ... an arrangement [involving an award of custody to Ms. Howard contingent on her living with the Thordersons], based on a mistaken assumption that it was beyond the court's power to enforce." Although the record indicates a conference was held in the judge's chambers, during which Ms. Howard argues this statement was made, the record does not contain this statement or anything like it.

On the contrary, the record reflects that the trial court concluded Ms. Howard should not have custody based on the testimony given throughout the trial. Toward the end of the trial, when Ms. Howard was testifying, the court interrupted her counsel and stated:

Counsel, look, that's not an issue here [whether Ms. Howard wanted custody of Clel]. I have had the therapists testify, the mother testify about custody. Let's not put this woman through that. It's hard enough for her now. Not one of them recommended that she have custody. Dr. Richfield [Clel's therapist in Pennsylvania] said, no, she wasn't. Her mother

said she wasn't. So I don't know why we're putting this woman through this.

Twice after this discussion, the court made express findings that it would not award Ms. Howard custody of Clel. During Mr. Duncan's counsel's closing arguments, the court interrupted and said:

That's a finding I'll make right now so nobody has to argue that. I would not award custody to the natural mother. That has come across loud and clear, and in good conscience I could not do that.... So that's a finding I'm making.

Finally, during Ms. Howard's counsel's closing argument, the court again interrupted and stated, "I have expressed my position to you on that and I will rule on that right now. Custody will not be awarded to the mother. That's the third time I've ruled and that's the last time." In any event, Ms. Howard had not actively sought Clel's custody other than as a mechanism for leaving de facto custody with the Thordersons, who Ms. Howard believed should have custody of Clel rather than herself.

 The record contains testimony that clearly supports the court's ruling not to award Ms. Howard custody of Clel. For example, Mr. Otanez, the expert who conducted a custody evaluation comparing Ms. Howard and Mr. Duncan, testified that Ms. Howard told him that she was content to have the Thordersons continue to take care of Clel and that she planned to have the Thordersons continue to maintain custody and care for Clel. Mr. Otanez testified Ms. Howard "felt like ... she just wasn't in the position to be a good caretaker for the child and that it would be better for the child to be with someone who was." Even the Thordersons' brief states "[Ms.] Howard did not actively pursue custody of [Clel] in this case."

Because the trial court made clear findings regarding its decision to not grant custody of Clel to Ms. Howard and those findings are well supported by the evidence given at trial, we conclude the trial court did not abuse its discretion by not granting custody to Ms. Howard, even in the context of her proposed contingent custody arrangement.

We have reviewed the appellants' other arguments and have found them to be without merit and, accordingly, decline to address them. *See State v. Carter,* 776 P.2d 886, 888–89 (Utah 1989) (holding that court may decline to address arguments without merit on appeal).

## CONCLUSION

The Thordersons and Ms. Howard have failed to show the trial court's findings regarding the *Hutchison* factors are clearly erroneous. Accordingly, they have failed to rebut the parental presumption, which Mr. Duncan enjoys as Clel's natural father. In addition, after reviewing the trial court's findings and the record, we hold the trial court did not abuse its discretion by refusing to grant Ms. Howard custody of Clel based on a contingent custody arrangement. We therefore affirm the trial court's decision to grant Mr. Duncan custody of Clel.

Affirmed.

ORME, P.J., and BENCH, J., concur.