JACKSON, Judge:
R.S. appeals the juvenile court’s order denying him custody of his son, J.M. We affirm.
BACKGROUND
In July 1992, J.M. was conceived by fifteen-year-old E.M. during a two-day relationship with eighteen-year-old R.S. When E.M. was about two months pregnant, she told R.S. she was carrying his child. In September 1992, E.M.’s grandfather confronted R.S. regarding R.S.’s responsibility for the pregnancy. From time to time during the pregnancy, R.S. heard rumors from acquaintances that E.M. was pregnant with his child. *529 Through all these communications, R.S. maintained a belief that he was not the baby’s father and initiated no contact with E.M.
J.M. was bom on April 15,1993. E.M. and her father paid all expenses related to the birth. When J.M. was about three months old, E.M. brought J.M. to meet R.S. In response, R.S. turned his back and walked away. Shortly thereafter, E.M. married M.P. They conceived J.M.’s half brother, N.P., who was born August 11,1994.
In September 1994, the Office of Recovery Services (ORS) requested that R.S. submit to a paternity test, which he did immediately. During the next several months, R.S. called ORS a couple of times for the test results, but received no answer.
In November 1994, the Division of Family Services (DFS)[1] filed a petition for custody of both J.M. and N.P., alleging that M.P. had severely abused the children and that E.M. was aware of the abuse, but had failed to protect the children. A shelter hearing was held. DFS did not know the identity of J.M.’s biological father at that time; thus, R.S. was given no notice and had no knowledge of the hearing. At the hearing, after M.P. and E.M. stipulated to the petition’s allegations, the juvenile court concluded the two children were neglected and abused and placed them in DFS custody. M.P. and E.M. agreed to comply with a treatment plan as pai’t of the court’s order.
In February 1995, J.M. was diagnosed with Reactive Attachment Disorder, a condition manifested by his indiscriminate sociability, lack of distress when left with total strangers, and lack of emotional attachment to any primary caregiver. This condition was apparently caused by the neglectful and abusive treatment J.M. received from his mother and stepfather.
In March 1995, ORS served R.S. with a paternity petition. Around that time, R.S. discovered J.M. was in foster care. In April 1995, R.S. married M.S. The paternity test results became available in May 1995, showing R.S. to be J.M.’s father. R.S. acknowledged paternity of J.M. in June 1995 and filed a motion for custody of J.M. in July 1995. The juvenile court ordered a study of R.S.’s home as a potential placement for J.M. and reviewed the matter in September 1995, when it further ordered a gradual visitation schedule be implemented for R.S. and J.M. Under the schedule, R.S. and twenty-nine-month-old J.M. met for the first time in September 1995. Their visits continued over the next several weeks until about two weeks before the custody trial, which was held on January 17,1996.
After trial, the juvenile court denied R.S.’s motion and allowed J.M. to stay with his foster parents. In denying the motion, the court determined the constitutional presumption favoring natural parents in custody proceedings had been rebutted as to R.S. Thus, the court went on to compare R.S. and the foster parents on equal footing in considering J.M.’s best interests and deciding that J.M. should stay with his foster parents.
R.S. appeals, arguing (1) insufficient evidence supported the trial court’s findings underlying its conclusion that the parental presumption had been rebutted; (2) even if the presumption was adequately rebutted, it was in J.M.’s best interests to be placed in R.S.’s custody; and (3) under Utah Code Ann. § 78-3a-307 (Supp.1994), J.M. should have been placed with R.S.[2]
*530 ANALYSIS
I. Parental Presumption
R.S. correctly asserts that, in a custody dispute between a natural parent and a nonparent, we begin with the presumption that placing a child with his or her natural parent is in the child’s best interests.[3] See Kishpaugh v. Kishpaugh, 745 P.2d 1248, 1250-53 (Utah 1987); Duncan v. Howard, 918 P.2d 888, 891-92 (Utah.Ct.App.1996); State ex rel. H.R.V., 906 P.2d 913, 916-17 (Utah.Ct.App.1995).
“[This presumption] is rooted in the common experience of mankind, which teaches that parent and child normally share a strong attachment or bond for each other, that a natural parent will normally sacrifice personal interest and welfare for the child’s benefit, and that a natural parent is normally more sympathetic and understanding and better able to win the confidence and love of the child than anyone else.”
Kishpaugh, 745 P.2d at 1250 (quoting Hutchison v. Hutchison, 649 P.2d 38, 40 (Utah 1982) (footnote omitted)) (emphasis omitted).
However, that presumption can be rebutted by evidence showing “a particular parent at a particular time generally lacks all three of the characteristics that give rise to the presumption.” Hutchison, 649 P.2d at 41. In other words, to rebut the presumption under Hutchison, the evidence must show “[1] that no strong mutual bond exists, [2] that the parent has not demonstrated a willingness to sacrifice his or her own interest and welfare for the child’s, and [3] that the parent lacks the sympathy for and under *531 standing of the child that is characteristic of parents generally.” Id. An analysis of the evidence vis-a-vis these factors “does not require an inflexible, formulaic approach.” H.R.V., 906 P.2d at 917. Rather, the evidence submitted “need only prove a ‘general’ lack, rather than a complete lack, of the parental characteristics.” Id.; accord Kish-paugh, 745 P.2d at 1252.
The trial court in this case found by clear and convincing evidence that R.S. lacked all three of these necessary parental characteristics and thus found he was not entitled to the parental presumption in the custody determination. R.S. attacks these findings, arguing they are supported by insufficient evidence and are therefore clearly erroneous.
“To successfully challenge a factual finding, [R.S.] must (1) marshal all of the evidence that supports the finding, and (2) demonstrate that, despite the evidence, the finding is so lacking in support as to be ‘against the clear weight of evidence’ and thus, clearly erroneous.” State ex rel. R.A.F., 863 P.2d 1331, 1333 (Utah.Ct.App.1993) (citation omitted). Although in his brief R.S. has focused mostly on the evidence supporting his arguments that the parental presumption applies to him, he has acknowledged some of the evidence supporting the juvenile court’s findings. Still, he has failed to show the evidence inadequately supports the findings. Below, we have fully marshaled the evidence supporting the findings and conclude the evidence as a whole sufficiently supports the juvenile court’s findings, which are thus not clearly erroneous.
As we review the evidence and unchallenged subsidiary findings supporting the juvenile court’s ultimate findings, we are mindful of two important considerations. First, “[i]t is the role of the juvenile court, not this court, to assess the weight and credibility of expert witnesses and to choose among their testimonies.” State ex rel. G.V., 916 P.2d 918, 920 (Utah.Ct.App.1996); see also R.A.F., 863 P.2d at 1333 (declaring “trial court is in a better position to observe factors bearing on credibility”).
And, second, the trial court’s finding that a parent does not possess the three Hutchison characteristics need not conform to a “wooden formula.” Kishpaugh, 745 P.2d at 1252. This is because “[a] determination that one such characteristic is lacking can be made neither with mechanical precision nor in a vacuum that excludes consideration of other characteristics. Such a determination requires an overall evaluation of the relationship between the parent and the child.” Id. While the Hutchison factors ensure that a trial court will concentrate on three main aspects, “the purpose of the presumption— furthering the best interests of the child — is in no way advanced by requiring a formulaic statement of the trial court’s conclusions regarding those characteristics.” Id. Similarly, we are cognizant of “the inherent imprecision of words when used to characterize emotional attachments and the highly fact-dependent, interdependent, and individualized nature of these determinations.” Id. at 1253.
With these principles in mind, we now catalog the unchallenged subsidiary findings of the trial court and marshal the evidence supporting the trial court’s factual findings that R.S. does not have “a strong, mutual bond” with J.M.,[4] has not shown “a willing *532 ness to put [J.M.’s] interests ahead of [his] own,” and lacks “the sympathy for and understanding of [J.M.] that is characteristic of parents generally.”
First, the following of the juvenile court’s factual findings are unchallenged: R.S. knew of E.M.’s pregnancy after he had intercourse with her, yet initiated no contact with her or J.M. through the first two years of J.M.’s life; R.S. paid for none of the expenses of J.M.’s birth and maintenance through the time of the custody hearing; when E.M. brought three-month-old J.M. to visit R.S., R.S. responded by turning his back and walking away; R.S. initiated no proceedings to conclusively determine his paternity of J.M., but waited for ORS to do so when J.M. was one year and seven months old; visitation sessions between R.S. and J.M. were “extremely traumatizing” to J.M.; Craig Ramsey, Clinical Director of the Family and Attachment Center, testified that “the attachment [J.M.] has to [R.S.] was that of a friend or an uncle and was not as a father”; “[R.S.] questioned his paternity but did nothing that demonstrated a timely and full commitment to the responsibilities of parenthood” during the pregnancy or after J.M.’s birth; R.S. consciously disregarded his parental obligations; “from the time of [J.M.’s] conception until July 1995, [R.S.] made no effort whatsoever to obtain physical custody, visit, communicate with, or exhibit any other actions whatsoever with respect to [J.M.] that might be said to manifest to [J.M.] or to those having physical custody of [J.M.] a firm intention to obtain physical custody or to make arrangements for the care of [J.M.] ”; and R.S. was not there when J.M. needed him at the time J.M. was being physically abused and then placed in DFS custody.
Second, documentary evidence[5] showed that: J.M. experienced increasing stress before and emotional and behavioral difficulties after visiting R.S.; during an evaluation of interaction between R.S. and J.M. by therapist Craig M. Ramsey on October 23, 1995, J.M. unenthusiastically greeted R.S., “reduced his verbalization and eye contact” when R.S. was around, became “aloof, cautious and avoidant with” R.S., regressed in some of his behaviors, became “less coordinated,” acted “sullen,” received “little pleasure from his interactions with” R.S., appeared stressed, and was relieved and soothed when he saw his foster mother; at his age, J.M. would have great difficulty establishing a trusting, emotionally connected relationship with R.S.; no significant emotional bond exists between J.M. and R.S.; and J.M. was insistent in describing his foster parents, not R.S. and his wife, as his “mommy” and “daddy.”
Finally, we review the trial testimony supporting the trial court’s findings. E.M. stated that: R.S. seemed like “he didn’t want to have anything to do with me or the child”; R.S. did not contact her during or after her pregnancy; R.S. did not help pay for J.M.’s birth or maintenance; and R.S. “turned his back and walked away” when E.M. brought three-month-old J.M. to see him.
Therapist Michael Gibbons opined that: J.M. was “distraught and anxious” and clung to his foster mother after visiting with R.S.; J.M. was very insistent in calling his foster home and parents “my home,” “my mommy,” and “my dad”; the bond between J.M. and R.S. was no more significant than that between a child and a “regular baby-sitter”; and, until his placement with his foster parents, J.M. was not significantly attached to anyone and viewed the world distrustfully.
Public health nurse Kathleen K. Reeves stated that in her association with J.M. she was not “aware of’ a “strong relationship” between J.M. and R.S. Aundrea Muirbrook stated that she accompanied E.M. to show three-month-old J.M. to R.S. and saw R.S. turn his back and walk away without showing any interest in or acknowledging J.M. E.M.’s father, testified that: his insurance and E.M.’s savings covered the expenses of J.M.’s birth; R.S. never “claim[ed]” J.M., never contacted E.M., and is “not no father to that *533 child as far as I’m concerned”; when E.M. took J.M. to meet R.S., R.S. “kicked them out of the house”; and he financially supported J.M. during J.M.’s first year.
J.M.’s foster mother testified that: J.M. refers to her and her husband as “mom and dad”; J.M. “never talks about ... [R.S.] spontaneously; after visits with R.S., J.M. always looked for “reassurance” that his foster parents were “my mommy, my daddy”; after J.M. received a toy gun for Christmas 1995, he pointed it at a picture of R.S., said “there, gone now,” and walked out of the room; J.M. stated on his own, “me live Daddy [R.S.] no more”; as the visitation schedule with R.S. progressed, J.M. became increasingly “aggressive” with his foster mother, especially after visits and when she tried to prepare him for visits; after one specific visit with R.S., as J.M.’s foster parents picked up J.M. from R.S.’s house and drove him home, J.M. was upset when the foster parents wanted to stop for errands, urging them to drive home faster; and J.M. had eating problems after visits with R.S.
J.M.’s foster father testified that: the more J.M. visits R.S., the worse J.M.’s behavior gets; J.M. has nightmares after visits with R.S.; and, in his opinion, J.M. has no attachment to R.S.
R.S. testified that: the reason he did not ensure earlier that he would have a relationship with J.M. was because he was “young” and “wasn’t sure what [he] wanted”; around the time of J.M.’s birth and early life, R.S. was a “jerk,” lived with “no responsibilities,” “came and went when [he] wanted to,” “was up all hours of the night” partying, and spent his money on “recreation”; his conduct regarding E.M. and J.M. was “irresponsible”; he made no effort to find J.M. — and did not want to find J.M.- — until he was served with ORS’s paternity petition; at the time he testified, R.S. had never paid child support for J.M.; R.S. did not pay medical expenses for J.M.’s birth; and, during J.M.’s first two years, R.S. did not send J.M. birthday or Christmas presents.
And, lastly, therapist Craig Ramsey opined that J.M. does not see R.S. and his wife “as the significant familiar parental caregivers in his life[, but sees them as] friends, associates, like he would an aunt or an uncle, but that’s an entirely different relationship than ... mother and father.”
These findings and evidence so clearly support the trial court’s findings that R.S.’s parental presumption was properly rebutted that further analysis is hardly required. It suffices to say that we are satisfied that the evidence supports a finding that this “particular parent at [this] particular time generally lacks all three of the characteristics that give rise to the presumption.” Hutchison, 649 P.2d at 41.
Still, despite this overwhelming evidence supporting the trial court’s findings, R.S. argues: (1) other evidence supports a finding that he is entitled to the parental presumption, and (2) much of the evidence is faulty because it involves the period before he had scientific proof that J.M. is his son and thus before he had any duty to establish a relationship. Responding to R.S.’s first argument, we agree that evidence also existed that would have supported the trial court in upholding R.S.’s parental presumption. However, as we noted above, “the trial court is in a better position to observe factors bearing on credibility and we will not disturb a factual assessment unless it clearly appears that the trial court was in error.” R.A.F., 863 P.2d at 1333. The juvenile court plainly chose to give more weight to the testimony and documentary evidence showing R.S.’s presumption was rebutted. See id. Thus, “although there is evidence to support both sides of the argument,” the trial court’s findings are not clearly erroneous. Id.
R.S.’s second argument fails to recognize the trial court’s findings were in present tense, as well as past tense, and were based on recent evidence, as well as less recent evidence. For instance, the trial court found R.S. does not “have a strong, mutual bond with ... [J.M.].” (Emphasis added.) This present-tense finding was based mostly on evidence of witness observations of J.M.’s behavioral difficulties and stated preferences that occurred from the time R.S. acknowledged paternity to a couple of weeks before trial. Certainly some of the findings and evidence relate to the period before R.S. *534 acknowledged paternity and tried to become involved in J.M.’s life. Even so, those findings and evidence are also important in supporting the trial court’s decision that R.S.’s parental presumption was rebutted at the time of trial: They show the underlying reason why the relationship between R.S. and J.M., at the time of trial, lacked closeness, sympathy and understanding, and lacked a sense of R.S.’s willingness to sacrifice for J.M.
In any event, we are unpersuaded by R.S.’s insistence that we ignore his behavior before the paternity determination. R.S. could have' taken the initiative to prove or disprove his paternity by filing a petition as early as during E.M.’s pregnancy and had testing done immediately upon J.M.’s birth. If, for personal reasons, he needed to wait for scientific proof before becoming a part of J.M.’s life, he could have — of his own volition — had that proof much sooner and begun much sooner to develop a strong, mutual bond, and to show a willingness to sacrifice and an ability to gain his son’s confidence and love.
Even better, R.S. could have involved himself in J.M.’s life immediately, simply based on his knowledge of his sexual contact with E.M.,[6] the timing of her pregnancy and J.M.’s birth (which coincided with the timing of sexual contact), and the direct confrontations with E.M. and her family and friends asserting R.S. was the baby’s father.[7] He could have concurrently sought scientific proof of paternity and later either continued or ended his relationship with J.M. based on the results. He would have had everything to gain and nothing to lose by such a strategy: He could have enjoyed the earliest days of J.M.’s life regardless of his biological status, while preserving his potential legal status as J.M.’s father.
However R.S. may have pursued a relationship with J.M., if he had done so sooner than he did, the record shows he likely would have been a good candidate for J.M.’s placement. Although we join the trial court in commending R.S. for finally trying to become a true father to J.M. after June 1995, we also affirm the trial court’s findings recognizing that R.S.’s earlier indifference and inaction toward J.M. precipitated the later relationship difficulties that refuted R.S.’s right to assert the parental presumption. Unfortunately, R.S.’s attempts were too little, too late.[8]
II. Best Interests
Once the parental presumption has been properly rebutted, as it has here, “the contestants for custody compete on equal footing, and the custody award should be determined solely by reference to the best *535 interests of the child.” Hutchison v. Hutchison, 649 P.2d 38, 41 (Utah 1982). R.S. argues the trial court erred in deciding that leaving J.M. with his foster parents, as opposed to placing him with R.S., was in J.M.’s best interests. Best interests determinations ‘“frequently turn on numerous factors that the trial court is best suited to assess, given its proximity to the parties and the circumstances.’ So long as the trial court has not abused its discretion, we will not substitute our judgment about the propriety of its custody award.” Kishpaugh v. Kishpaugh, 745 P.2d 1248, 1253 (Utah 1987) (citation omitted); accord Hutchison, 649 P.2d at 41.
Although “there ‘is no definitive checklist of factors to be used for determining custody since such “factors are highly personal and individual,” ’ ” Tucker v. Tucker, 881 P.2d 948, 951-52 n. 2 (Utah.Ct.App.1994) (citations omitted), rev’d on other grounds, 910 P.2d 1209 (Utah 1996), some factors that may be considered in determining a child’s best interests are:
the preference of the child; keeping siblings together; the relative strength of the child’s bond with one or both of the prospective custodians; and, in appropriate eases, the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted. Other factors relate primarily to the prospective custodians’ character or status or to their capacity or willingness to function as parents: moral character and emotional stability; duration and depth of desire for custody; ability to provide personal rather than surrogate care; significant impairment of ability to function as a parent through drug abuse, excessive drinking, or other cause; reasons for having relinquished custody in the past; religious compatibility with the child; kinship, including, in extraordinary circumstances, stepparent status; and financial condition. (These factors are not necessarily listed in order of importance.)
Hutchison, 649 P.2d at 41 (footnotes omitted).
The trial court in this case made extensive and specific findings regarding every applicable factor. For instance, first, regarding the relative strength of the bond between J.M. and his foster mother, as opposed to the bond between J.M. and R.S., the trial court found that “the attachment/bonding of [J.M.] to the foster mother is not only very strong but is rare and exceptional,” while finding that J.M. and R.S. had no strong, mutual bond. Second, regarding “the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted,” the trial court made several findings, an example of which is: “[J.M.] has changed from being insecure, withdrawn, and confused to active, age-appropriate, and happy while in his present foster home[, and] ... any change in custody would certainly cause trauma to [J.M.].” Third, regarding “keeping siblings together,” the trial court found that “it would be detrimental to separate [J.M.] and [N.P.] from one another” and “it is in the children’s best interest to keep them together.” Fourth, the trial court found that “the foster parents compare favorably with respect to moral character and emotional stability, the duration and depth and desire they have for custody, and their ability to provide personal as opposed to surrogate care as well [as] in their financial condition.” And, fifth, regarding “the preference of the child,” the trial court found that “[J.M.] would prefer to stay with [his] foster parents.”
R.S. has not challenged the trial court’s findings relating to the above factors, but instead argues only that other evidence supports placement of J.M. with him. We therefore have no grounds upon which to conclude the trial court abused its discretion because it supported its ultimate custody decision with proper factual findings. Moreover, our exhaustive review of the record in this ease reveals considerable evidentiary support for the trial court’s findings.
III. Sections 78-3a-306 and -307
Regardless of the result produced by the above analysis, R.S. argues that he is entitled to custody under Utah Code section 78-3a-307(l)(a), which reads:
When the court orders that a child be removed from the custody of his parent in accordance with the requirements of this *536 part, the court shall first determine whether there is another natural parent, with whom the child was not residing at the time the events or conditions that brought him within the court’s jurisdiction occurred, who desires to assume custody of the child. If that parent requests custody, the court shall place the minor with that parent unless it finds that the placement would be unsafe or otherwise detrimental to the child.
Utah Code Ann. § 78-3a-307(l)(a) (Supp.1994) (emphasis added).
R.S. first asserts that, because he requested custody under this section, “the court shall place” J.M. with R.S., as his natural parent. Id. However, R.S. misreads the subsequent language modifying the court’s duty: “unless [the court] finds that the placement would be unsafe or otherwise detrimental to the child.” Id. (emphasis added). R.S. interprets this to require a specific finding that his particular home would be detrimental to J.M. before denying him custody. However, the juvenile court’s findings repeatedly state that, because of J.M.’s “severe Attachment Disorder” and related emotional difficulties, any change of J.M.’s custody — by obvious inference including placement with R.S. — would be detrimental. Those findings are sufficient under the statute to show the trial court determined placement with R.S. would be “otherwise detrimental.” Moreover, those findings are supported by the record.
R.S. also contends the court erred in failing to notify him of the shelter hearing as required by sections 78-3a-306 and -307. Section 78-3a-306(3)(b) states that notice of a shelter hearing shall be afforded the child’s parents, “unless they cannot be located.” Utah Code Ann. § 78-3a-306(3)(b) (Supp.1994). Section 78-3a-307(l)(a) states that “the court shall first determine whether there is another natural parent ... who desires custody” before placing the child with a relative or DFS. Utah Code Ann. § 78-3a-307(l)(a) (Supp.1994).
However, the juvenile court found that at the time of the shelter hearing R.S.’s identity was unknown, and, thus, he had no notice of the hearing.[9] The DFS petition initiating the shelter hearing states that the identity and location of J.M.’s father was unknown. And, because we have no transcript of the shelter hearing proceedings, we have no way to determine whether the trial court probed for information regarding the existence and whereabouts of J.M.’s other natural parent, as required by statute. Consequently, we must accept the juvenile court’s finding that R.S.’s identity and location were unknown, and, assuming the regularity and propriety of the proceedings below, presume the trial court observed this statutory directive. See Ames v. Maas, 846 P.2d 468, 474 (Utah.Ct.App.1993) (“Without the whole record before us, we assume the regularity of the proceedings below, especially in light of the fact that the portions before us do not indicate prejudice.”).
We therefore have no grounds upon which to reverse the trial court’s correct application of section 78-3a-307(l)(a), denying R.S.’s custody motion.
CONCLUSION
Because they are supported by sufficient evidence, we conclude the trial court’s findings regarding the rebuttal of R.S.’s parental *537 presumption are not clearly erroneous. Further, we conclude the trial court did not abuse its discretion in determining it is in J.M.’s best interests to stay in his foster parents’ custody. Finally, we conclude that the trial court was not required to place J.M. in R.S.’s custody under Utah Code Ann. § 78-3a-307 (Supp.1995) because that placement would be detrimental to J.M., and that R.S. was not entitled to notice of the shelter hearing because his identity and location were unknown by DFS and the juvenile court at the time of the hearing. Accordingly, we affirm.
GREENWOOD, J., concurs.

. Under Utah Code Ann. § 62A-4a-103 (1997), DFS is now referred to as the "Division of Child and Family Services.”

. R.S. also contends the juvenile court erred in failing to properly consider the expert testimony favorable to R.S. and in combining R.S.’s custody hearing with E.M. and M.P.'s dispositional review hearing. However, we do not address these issues because R.S. has not provided sufficient legal argument as required by Utah Rule of Appellate Procedure 24(a). See Bums v. Sum-merhays, 927 P.2d 197, 199-200 (Utah.Ct.App.1996).
R.S. further argues his due process rights were violated in two ways: (1) His parental rights were effectively terminated without proof he was an unfit parent, and (2) he was not notified of the November 1994 shelter hearing at which he could have moved for custody under Utah Code Ann. § 78-3a-307 (Supp.1994). Regarding his first argument, although the trial court used language from parental termination and adoption law, this case involves nothing more than a custody determination. R.S.’s parental rights were not terminated in the proceeding below. Thus, we decline to address this prematurely raised *530 issue, noting “the standard governing actions for termination of parental rights is not applicable to child custody disputes.” Sanderson v. Tryon, 739 P.2d 623, 627 (Utah 1987). Regarding his second argument, R.S. did not assert before the trial court the issue of whether he was entitled to greater effort on the part of the State to determine his existence and location so as to notify him of the shelter hearing. Thus, we decline to address this unpreserved issue. See In re Estate of Morrison, 933 P.2d 1015, 1017 (Utah.Ct.App.1997).
R.S. did not appeal the portion of the trial court’s order requiring him to pay child support and did not properly appeal the portion of the order denying him visitation. R.S. mentioned 'the visitation.ruling only in passing in his statement of issues, number seven, but did not even allude to it again in his brief. We thus do not review the trial court's child support or visitation rulings.
However, even if we were to consider the visitation ruling on its merits, we would conclude the trial courL did not abuse its discretion in denying R.S. visitation. See Watson v. Watson, 837 P.2d 1, 4 (Utah.Ct.App.1992) (stating "we will disturb the trial court’s visitation determination only upon a showing that the trial court has abused its discretion”). All the evidence we have marshaled supporting the trial court’s denial of R.S.’s custody motion likewise supports the trial court's denial of visitation for R.S.

. As an alternative, the State argued to the trial court and argues here that R.S. is, at the outset, not entitled to the parental presumption based on the following language from Hutchison v. Hutchison, 649 P.2d 38 (Utah 1982): "The presumption does not apply to a parent who would be subject to termination of all parental rights due to unfitness, abandonment, or substantial neglect, since such a parent is a fortiori not entitled to custody.” Id. at 41. The juvenile court in this case found that R.S. had abandoned J.M. and, therefore, R.S. was not entitled to the parental presumption. The court seemed to use this analysis as an alternative way to reach the best-interests inquiry in which the contestants for custody — including the child’s natural parent— compete for custody on equal footing.
Because this is a custody case, not a parental rights termination case, it seems confusing and unwarranted to address grounds for termination. Our research has not revealed a case — including Hutchison — in which the above language from Hutchison was used to support a hypothetical parental-righls-lerminalion analysis. Indeed, in Sanderson, the supreme court stated that "the standard governing actions for termination of parental rights is not applicable to child custody disputes.” 739 P.2d at 627. All Utah custody cases we have found in which a natural parent competed with a nonparent for custody simply start, as we do here, with the parental presumption and address whether the presumption was rebutted. The language from Hutchison appears to be dicta, not intended as an alternative way to reach the best-interests inquiry in these types of cases.
If a parent’s rights are indeed subject to termi- ■ nation, the proper approach would seem to be to address the issue squarely by bringing a termination petition, instead of muddying the waters of both a custody determination and a potential termination proceeding with theoretical findings of grounds for termination. However, we need not address the propriety of the juvenile court's use of the Hutchison language in this case because our analysis assumes R.S. had the right to assert the parental presumption, and then determines that presumption was properly rebutted in reaching the best-interests inquiry.

. R.S. argues Duncan v. Howard, 918 P.2d 888 (Utah.Ct.App.1996), supports his argument that he need not have an existing strong, mutual bond with J.M. to assert the presumption, but he need only have the potential to develop such a bond. In Duncan, the trial court found the presumption was not rebutted, even as it also found that a strong, mutual bond did not exist at that time between the natural father and his son. See id. at 893. Nonetheless, the court did find that "a strong bond could develop.” Id. This court affirmed, stating the potential for bonding was enough, based on the specific facts involved, to prevent a finding that the presumption had been rebutted, particularly in light of the fact that the existence of the other two characteristics had not been rebutted. See id.
Duncan, however, is inapposite to this case. First, all three characteristics have been rebutted here. Second, the juvenile court did not find that a strong bond could develop between R.S. and J.M. Finally, unlike R.S., as soon as the father in Duncan knew of his son's existence, he acknowledged his son, arranged visits with his son, and made payments toward his son’s maintenance. See id. at 890. The father in Duncan had been prevented from establishing a stronger bond due almost entirely to circumstances outside his control. See id. at 890-91.

. This evidence consisted of: Foster mother’s "Visitation logs” (dated from about September 7, 1995 to January 2, 1996); DFS "Court Report” (dated October 24, 1995); Craig Ramsey’s "Bonding Assessment Evaluation and Recommendations” (dated October 23, 1995); Kathleen K. Reaves’s report (dated November 6, 1995); and Michael Gibbon's report (dated January 5, 1996).

. We note that through his dilatory behavior in establishing a relationship with J.M., R.S. risked far more than an opportunity for custody — he risked never again seeing and knowing his son, based on Utah's adoption statute. See Utah Code Ann. § 78-30-4.13(1) (Supp.1995) (stating "[a]n unmarried biological father, by virtue of the fact that he has engaged in a sexual relationship with a woman, is deemed to be on notice that a pregnancy and an adoption proceeding regarding that child may occur, and has a duty to protect his own rights and interests”); id, §§ 78-30-4.12 to-4.17.

. R.S. admitted in trial testimony that he had wondered whether he was J.M.’s father — apparently, that reasonable possibility was not completely foreclosed in his mind.

. We note the policy underlying the "Abuse, Neglect, and Dependency Proceedings” part of the Child Welfare Reform Act, see Utah Code Ann. §§ 78-3a-301 to -316 (Supp.1995), under which children like J.M. may be removed from the home of their natural parents and placed in foster care, is one of swift permanency. See Sara E. Bouley, Recent Legislative Development, Utah’s Child Welfare Reform Act Amendments, 1995 Utah L.Rev. 1232, 1236; Victoria P. Coombs, Recent Legislative Development, Utah’s Child Welfare Reform Act, 1994 Utah L.Rev. 1589, 1592. The Utah Legislature has decided that parents who abuse or neglect their children have a limited time during which to rectify their situations, or they risk losing their legal relationships with their children. See Utah Code Ann. §§ 78-3a-301 to-414 (Supp.1995).
Interestingly, the policies underlying the somewhat-related adoption statute are the same: "[T]he state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner,” and "an unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood, both during pregnancy and upon the child’s birth.” Id. § 78-30-4.12(2)(a), (e).

. R.S. indirectly challenges this finding,' arguing because ORS initiated a paternity test for him two months before the shelter hearing, DFS should have known his identity and location. Thus, R.S. asserts, he should have been notified of the shelter hearing. However, R.S. does not show how it follows from this that the juvenile court or DFS knew of or ignored his existence at the time of the shelter hearing. Further, R.S. provides no law supporting his implication that information known to government employees at one state office or division can be imputed to government employees at a different state office or division.
We note that by initiating a paternity proceeding and filing a notice of that action with the state registrar of vital statistics within the Department of Health, R.S. could have put DFS on notice of his existence and location. Indeed, R.S. was not helpless to receive notice of events affecting his son’s legal status. Further, we have no reason to believe R.S.’s attitude toward J.M. at the time of the shelter hearing would have been any different than it was up to that point and beyond. At that time, he still had no scientific proof he was J.M.’s father and, thus, apparently felt no obligation to him.