958 P.2d 943 (1998)
State of Utah, in the interest of J.M.V. and S.M.V., persons under eighteen years of age.
J.L.V., Appellant,
v.
STATE of Utah, Appellee.
No. 970194-CA.
Court of Appeals of Utah.
May 7, 1998.
*944 Dean N. Zabriskie and Dana M. Facemyer, Provo, for Appellant.
Jan Graham and Todd A. Utzinger, Salt Lake City, for Appellee.
Martha Pierce, Salt Lake City, Guardian Ad Litem.
Ann Wasserman, Salt Lake City, for the Spencers.
Before DAVIS, P.J., WILKINS, Associate P.J., and BENCH, J.

OPINION
WILKINS, Associate Presiding Judge:
J.L.V. (Father) appeals the juvenile court's February 1997 order that granted legal custody and guardianship of his two daughters to the girls' maternal aunt and uncle. Father argues the juvenile court erred in not awarding him custody and guardianship of his daughters because the parental presumption was never rebutted. We affirm.

BACKGROUND
This appeal involves several people. Father was married to Mother until November 1994. Two girls were born to Father and Mother: J.M.V., born in July 1987, and S.M.V., born in June 1989 (the girls). The Spencers, who live in California, are the girls' maternal aunt and uncle. D.V. and M.V. are Mother's natural sons, the girls' half-brothers, and were raised as Father's stepsons.
Father and Mother's entire marriage was riddled with conflict and punctuated by verbal and physical altercations. On numerous occasions, Father verbally and physically abused Mother in front of the girls. This abuse included incidents of Father grabbing, shaking, and kicking Mother while he verbally threatened her. For example, in February 1993, in front of the girls, Father physically restrained Mother and threatened to "splatter her brains all over the wall."
Father and Mother divorced in November 1994, and Mother was awarded custody of the girls. D.V. and M.V. also continued to live with Mother.
*945 After the divorce, intense conflict between the parents continued to affect the family's relationship. For instance, in December 1994, with the girls present, Father pushed Mother against a vehicle and threatened her with bodily harm.
Mother suffered from serious depression and feared that Father would return and carry out his threats to kill her. To help allay Mother's fears, D.V. slept with a loaded gun under his pillow. The girls were well aware of Mother's fears and the threats that caused them.
Father did not visit the girls from September 1995 to March 1996, when Mother committed suicide. On the day Mother killed herself, the girls, then six and eight years old, were taken into protective custody and placed with the Spencers in California. Father was living in St. George, Utah at the time.
Soon after Mother died, the State filed a petition alleging the girls were neglected and dependent children, and a shelter hearing followed. After the hearing, the juvenile court entered findings of fact and orders. The court found that the girls were suffering severe emotional damage, indicated by extreme anxiety, depression, withdrawal, or negative aggressive behavior towards themselves or others. The court found that there was no way of protecting the girls' mental health without keeping them from Father's custody. As a result, the court found it would be contrary to the girls' welfare to live with Father and that it was in the girls' best interests to be placed in the temporary custody of the Division of Child and Family Services (DCFS). Consequently, the court ordered that the girls be placed in the temporary custody of DCFS, that DCFS provide services to reunify the girls with Father, and that DCFS evaluate Father to determine if placement with him would be appropriate. After the court entered its findings and order, the Spencers filed a motion for kinship placement.
In April 1996, the case came before the juvenile court for trial on the State's neglect and dependency petition. However, because more time was needed to take evidence, the court continued the trial until May 1996. Before the next trial date, the DCFS caseworker filed a report with the court recommending that the girls be returned to Father.
In May 1996, the matter again came before the juvenile court for trial on the State's neglect and dependency petition. Based on the DCFS report, the State filed a motion to withdraw and dismiss its petition. The girls' Guardian Ad Litem recommended that the girls continue to stay with the Spencers, and the Spencers filed a petition for custody. The court denied the State's motion to withdraw its petition and found that it would be in the girls' best interests to be placed in the temporary custody of the Spencers. The court ordered that the girls be placed in the Spencers' temporary custody and that DCFS maintain protective supervision of the girls and continue working to reunify the girls with Father. The court then set a date for a trial on the State's petition.
In June 1996, the Spencers filed a Verified Petition for Custody, requesting permanent custody of the girls. In their petition, the Spencers alleged that Father was not an appropriate caretaker for the girls and that he had emotionally abused the girls.
In July 1996, Dr. Urban of DCFS filed a letter with the court recommending that, because of the girls' response to the contact they had with Father and because of their "fragile nature," the court should "go slow on `pushing the girls' regarding visits with [Father]."
In October 1996, M.V., one of the girls' half-brothers, committed suicide. Consequently, the juvenile court moved the date for the scheduled trial to January 1997.
The trial ended in February 1997. Among its many findings of fact, the juvenile court found the following:
13. [The girls] are very troubled little girls. In their most formative years they have experienced such extreme trauma at the hands of their parents, including [Mother]'s suicide, that they are both developmentally delayed with numerous psychological illnesses as well as corresponding physical manifestations, including an increase in night terrors and psychosomatic complaints. This is particularly true for *946 [J.M.V.], who is showing signs of anxiety and serious childhood depression.
14. Under the direction of their therapist, Ms. Wills, the subject children have yet to be told how [Mother] died. This is due, in part, to the concern that they will blame her death on [Father]. In addition, the subject children have yet to be told of their brother's suicide. The children have functioned well overall psychologically and behaviorally since placement with the Spencers. However, regression occurs preceding planned visitation with [Father]. Their regression becomes more pronounced immediately prior to Court proceedings involving their placement. [J.M.V.'s] night terrors, which had essentially disappeared after the proceedings in August, have returned. [S.M.V.'s] psychosomatic complaint of leg pain and subsequent limping have also returned, and she has recently awakened crying in the morning from nightmares in which she dreamed [Father] was killing people she loved, including herself. Both daughters have expressed to the Court and their therapist that they are afraid of [Father] and do not want to return to his care.
15. The children need an extended period of time to feel absolutely safe, and to experience the security and stability necessary to enable them to heal. The children have not been amenable to treatment due to the uncertainty and disruptiveness of the litigation concerning visitation and placement. According to the children's therapist, [S.M.V.] could become a suicidal risk if she were to be returned to [Father] prior to developing a trusting relationship with him. The children's fear of visiting or being returned to [Father] prevents them from progressing in therapy. Ironically, it also prevents them from establishing a loving and secure relationship with [Father]. Therapeutically, the needed security would facilitate addressing and resolving their underlying psychological difficulties and likely make them more responsive to the reparation of their relationship with [Father]. The evidence is clear and convincing that returning the subject children to [Father] at this time would create a substantial risk of detriment to their emotional well-being.
16. It would be in the children's best interest to be told that they can remain with the Spencers indefinitely. This would remove a substantial amount of the fear they feel and allow them to commence working through their issues with their therapist concerning the suicidal deaths of [Mother] and [their] step-brother. In addition, it would allow them to view visitation with [Father] as something fun and positive, secure in the knowledge that they can remain in the Spencer[s'] custody.
17. [Father] is a practical person who focuses on getting things done, particularly involving concrete matters. His emotional sensitivity is moderately low, and he may have difficulty understanding and being aware of the sensitive feelings of his daughters. He also has demonstrated very little awareness of the negative impact of the history of marital turmoil upon his daughters. There is concern that he will continue to be disrespectful in his comments to the subject children about their deceased mother or let her memory fade. He loves his children and desires to have them in his custody. He is currently in the process of taking the necessary steps to improve his parenting skills by engaging in therapy and completing parenting classes. He has a history of being a stable and hard working employee. He does have a history of excessive use of alcohol, but currently is not drinking to the point of interfering with his ability to parent. [Father] loves his daughters and sincerely desires to parent his children. It is [Father]'s desire to move his family to his home state of Pennsylvania where he can receive help and support from his family.
18. ... The Spencers have provided the subject children with a safe, secure and loving environment. For the first time in their lives, [S.M.V.] and [J.M.V.] are living in an atmosphere devoid of anger, violence and fear. The Spencers have earnestly attempted to provide the subject children with appropriate psychological counseling, educational training, and recreational opportunities. They demonstrate sincere affection for said children and have affirmed *947 their desire to provide for said children for whatever time period is necessary to ensure their best interests.
19. It would be in the best interests of the subject children to remain in the custody of their maternal aunt and uncle while they heal from their emotional illnesses and in the process establish a relationship with [Father] which is devoid of fear.
The juvenile court then concluded:
1. That [Father]'s violent and threatening conduct towards the deceased mother in the presence of the children constituted emotional abuse of said children. The emotional abuse has traumatized [S.M.V.] and [J.M.V.] to the point of causing mental and emotional damage. Therefore, this Court concludes that the subject children are "neglected" pursuant to [Utah Code Ann.] Section 78-3a-2(16), in that they lack proper parental care by reason of the fault or habits of [Father].
. . . .
3. The return of the subject children to [Father] at this point in time would create a substantial risk of detriment to the girls' emotional well-being. This Court concludes that it is in the subject children's best interest to be placed in the custody of the Spencers and to commence a treatment plan for the establishment of a trusting and loving relationship with [Father].
Having found the allegations of abuse and neglect against Father to be true under Utah Code Ann. § 78-3a-2(16) (Supp.1995),[1] the court then awarded legal custody and guardianship of the girls to the Spencers, nunc pro tune, as of April 1, 1996, pursuant to Utah Code Ann. § 78-3a-516 (1996),[2] which grants the juvenile court authority for various dispositional alternatives.
Father appeals.

ISSUE AND STANDARDS OF REVIEW
Father argues the trial court committed reversible error when it awarded the Spencers custody of the girls because the trial court never ruled on the parental presumption and because, he argues, the evidence does not support a rebuttal of the parental presumption. Based on the parental presumption, Father argues, the trial court should have awarded him custody of the girls.
Juvenile courts have broad discretion in child custody cases; therefore, we will not disturb the juvenile court's custody determination "`if it is consistent with the standards set by appellate courts and supported by adequate findings of fact and conclusions of law.'" Duncan v. Howard, 918 P.2d 888, 891 (Utah Ct.App.1996) (citation omitted). We review the juvenile court's conclusions of law for correctness. See State v. Pena, 869 P.2d 932, 936 (Utah 1994). However, we will set aside findings of fact only if they are clearly erroneous. See Duncan, 918 P.2d at 891. To successfully challenge the juvenile court's findings of fact, Father must "`marshal all the evidence supporting the trial court's findings and then ... show the evidence to be legally insufficient to support the findings.'" Id. (citation omitted).

ANALYSIS
The parental presumption is a strong but rebuttable presumption that it is in a child's best interests to be in the custody of his or her natural parent. The parental presumption "recognizes the natural right and authority of the parent to the child's custody.'" Hutchison v. Hutchison, 649 P.2d 38, 40 (Utah 1982) (citation omitted). In addition, a parent may "rely on the parental presumption to prevent the transfer of his or her child's custody to a nonparent, unless the presumption has been rebutted or otherwise lost." State ex rel. H.R.V., 906 P.2d 913, 917 (Utah Ct.App.1995).
Showing a lack of the three parentchild characteristics articulated in Hutchison[3] is not the only way the parental presumption *948 may be rebutted or lost. For example, the parental presumption does not apply if the parent is "subject to the termination of all parental rights due to unfitness, abandonment, or substantial neglect." Hutchison, 649 P.2d at 41; cf. State ex rel. H.R.V., 906 P.2d at 917 ("[T]he parental presumption is based on the characteristics pertaining to a healthy parent-child relationship. When custody has been transferred from a natural parent to a nonparent, it is because the parent has been shown to lack those parental characteristics which give rise to the presumption." (emphasis in original)). In such cases we need not follow Hutchison's analysis because a parent who is subject to having his or her parental rights terminated "is a fortiori not entitled to custody." Hutchison, 649 P.2d at 41.
Similarly, the trial court is not obligated to follow the Hutchison analysis in cases brought before the court on abuse, neglect, or dependency petitions. See Utah Code Ann. §§ 78-3a-301 to -319 (1996 and Supp.1997) (setting forth laws regarding abuse, neglect, and dependency proceedings in juvenile court); State ex rel. R.L., 17 Utah 2d 349, 351, 411 P.2d 839, 840 (1966) (upholding trial court's decision that child's custody would remain with foster parents after declining to apply parental presumption in favor of child's natural mother). Like other cases affecting the custody of children, courts deciding abuse, neglect, and dependency cases are obligated to promote the best interests of the children involved. See id. § 78-3a-102(5)(g) (Supp.1997) (stating that purpose of juvenile court is to, "consistent with the ends of justice, strive to act in the best interests of the minor[s] in all cases and attempt to preserve and strengthen family ties where possible"); id. § 78-3a-312(3)(b) (Supp.1997) (stating that if after dispositional review hearing child is not returned to his or her parent, "court may, in its discretion, enter any ... order that it determines to be in the best interest[s] of the child"); id. § 78-3a-315(3)(c) (1996) (stating court "shall base its determination on the best interest of the child"); id. § 78-3a-314(5) (Supp.1997) (providing that in every abuse, neglect, or dependency proceeding, court shall order that child be represented by Guardian Ad Litem, who shall represent child's best interests). The Legislature has determined, as evidenced by the statutory scheme, that in cases involving a petition alleging the abuse, neglect, or dependency of a child, the parental presumption does not apply. In other words, unlike in the Hutchison line of cases, the law does not presume that it is in a child's best interests to be in the custody of the child's parent when that parent has been found by clear and convincing evidence to have neglected or abused the child, or when the child is dependent. The Legislature has determined that abuse or neglect of a child at the hands of a parent, or dependency of a child, is incompatible with the presumption that the child is best served by being in the parent's custody.
As a result, the trial court did not need to evaluate the three Hutchison characteristics in this case. Although both the State's neglect petition and the Spencers' custody motion were before the juvenile court, the court ruled only on the State's neglect petition when it found that Father had abused and neglected the girls.[4] Thus, because the court based its decision on the neglect petition rather than on the custody dispute between the Spencers and Father, the court did not need to consider the parental presumption.
We hold that as a matter of law the parental presumption did not apply to the court's determination of the girls' custody after it found by clear and convincing evidence that Father had abused and neglected the girls. Consequently, we reject Father's argument that the trial court erred by not considering the parental presumption before awarding the Spencers continued custody of *949 the girls. We therefore affirm the trial court's findings and custody order.

CONCLUSION
Because the trial court based its decision on the State's neglect petition and because the trial court found that Father had abused and neglected the girls, the parental presumption as a matter of law did not apply to the court's order awarding the Spencers continued custody of the girls. We therefore reject Father's argument and affirm the trial court's custody order.
Affirmed.
DAVIS, P.J., and BENCH, J., concur.
NOTES
[1] This section has been renumbered as Utah Code Ann. § 78-3a-103(q)(i) (Supp.1997).
[2] This section has been renumbered as Utah Code Ann. § 78-3a-118 (Supp.1997).
[3] Hutchison established that to rebut the parental presumption, evidence may be shown that

a particular parent at a particular time generally lacks all three of the characteristics that give rise to the presumption: [1] that no strong mutual bond exists, [2] that the parent has not demonstrated a willingness to sacrifice his or her own interest and welfare for the child's, and [3] that the parent lacks the sympathy for and understanding of the child that is characteristic of parents generally.
Hutchison, 649 P.2d at 41.
[4] Father has not challenged the court's finding of neglect, nor has he argued the trial court did not appropriately follow the statutes governing neglect cases.