2001 UT App 314

STATE of Utah, in the interest of L.M., a person under eighteen years of age.

T.M. and J.M., Appellants,

v.

State of Utah, Appellee.

No. 20000323–CA.

Court of Appeals of Utah.

Oct. 25, 2001.

Steven C. Russell and G. Brent Smith, Salt Lake City, for Appellants.

Mark L. Shurtleff, Attorney General and John Peterson, Attorney General's Office, Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before Judges BILLINGS, ORME, and THORNE.

## OPINION

THORNE, Judge:

¶1 Appellants T.M. (Father) and J.M. (Mother) (collectively Parents) appeal from the juvenile court's determination that K.M. had been abused prior to her death, and that L.M. was neglected. Parents also appeal the juvenile court's resulting dispositional order permanently placing L.M. with her maternal grandparents and indefinitely extending the court's existing gag order. We affirm in part and reverse in part.

## BACKGROUND

¶2 We recite the facts in a light most favorable to the juvenile court findings. *See Tucker v. Tucker*, 910 P.2d 1209, 1216 (Utah 1996).

¶3 On July 14, 1999, at approximately 11:15 am, some thirteen hours after putting four month old K.M. to bed, Parents discovered that she was not sleeping, but instead, lay lifeless in her crib, a blanket wrapped tightly around her head. Because K.M. was not breathing, Parents called 911. Soon thereafter, paramedics arrived and transported K.M. to Ogden Regional Medical Center where doctors pronounced her dead on arrival. Then, following routine procedures, emergency room personnel noted that K.M.'s body was warm and supple on arrival, and that her internal temperature was 98.4 degrees.

¶4 Additionally, the two nurses involved in preparing K.M.'s body removed her diaper, noting that K.M. had been changed recently, and that the diaper was relatively dry and contained only a small amount of feces. The nurses also noticed large abrasions on K.M.'s labia majora and that K.M.'s vaginal and anal openings were enlarged. Following a consultation with two emergency room physicians, the nurses notified the Division of Child and Family Services (DCFS), the Weber County Children's Justice Center, and the local police department.

¶5 Later that day, K.M.'s body was transported to the Weber County Children's Justice Center, where Jeanlee Carver, a nurse practitioner trained in the area of child abuse, performed a colposcopic examination.

As a result of the examination, Ms. Carver discovered three notable injuries: (1) abrasions to K.M.'s right and left labia majora; (2) petechial hemorrhaging in K.M.'s labia minora; and (3) hemorrhages and lacerations at the posterior fourchette of K.M.'s vagina. Ms. Carver noted that the labial injuries were the result of some sort of abrasion, and concluded that all of the injuries were "positive for non-accidental traumatic injury to the genitalia, physical or sexual abuse."

¶ 6 Ms. Carver forwarded her report, as well as the still pictures and video footage resulting from her examination, to Dr. Karen Hansen, a physician working with Primary Children's Child Protection Team.[1] Dr. Hansen reviewed the material and concluded that the "the most likely etiology [to explain the injuries to K.M.'s genitals] was inflicted trauma."

¶ 7 After Ms. Carver completed her exam, K.M.'s body was taken to the Utah Medical Examiner's Office where doctor Ed Leis, the chief deputy medical examiner, performed an autopsy. Dr. Leis confirmed the injuries to K.M.'s genitals and concluded that the injuries occurred prior to K.M.'s death, but he was unable to determine the cause of the injuries. Dr. Leis was also unable to determine the cause of K.M.'s death.

¶ 8 On July 19, 1999, DCFS filed a verified petition seeking custody of L.M. based upon the circumstances surrounding K.M.'s death and the evidence of sexual abuse. The petition came to trial on January 6 and 7, 2000. At trial, both the State and Parents presented evidence and witness testimony supporting their positions. On February 29, 2000, the juvenile court issued findings of fact and conclusions of law.

¶ 9 Based on the evidence presented, the juvenile court concluded that K.M., pursuant to Utah Code Ann. § 78–3a–103(1)(a) (1996), had been abused and therefore, L.M., pursuant to Utah Code Ann. § 78–3a–103(a)(r)(i)(D) (1996), was a neglected child. As a result of these findings, on March 22, 2000, the juvenile court issued a Dispositional Order placing L.M. in the permanent custody of her maternal grandparents. The order also permitted Parents' continued supervised visitation and continued the juvenile court's previously issued gag order prohibiting all involved parties from discussing the case with the media. Parents now appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 10 After reviewing Parents' arguments, we have distilled Parents' concerns into three substantive issues.

¶ 11 First, Parents argue that the evidence presented at trial was insufficient to support the juvenile court's findings of fact.[2] We review challenges to the juvenile court's findings of fact for clear error. *See In re E.D.*, 876 P.2d 397, 402 (Utah Ct.App.1994). Unless the findings are against the clear weight of the evidence, we will not set the juvenile court's findings aside. *See State v. C.K.*, 2000 UT App 11,¶ 17, 996 P.2d 1059.

¶ 12 Parents next assert that even if the evidence is sufficient to support the court's findings, the findings do not support the juvenile court's conclusions of law; therefore, the court's dispositional order violates Utah law. We review a juvenile court's legal conclusions for correctness; however, we grant the juvenile court a measure of discretion when applying the law to a specific fact scenario. *See In re L.P.*, 1999 UT App 157,¶ 4, 981 P.2d 848. Moreover, "[j]uvenile courts have broad discretion in child custody cases." *In re J.M.V.*, 958 P.2d 943, 947 (Utah Ct.App.1998); *see also In re W.S.*, 939 P.2d 196, 199–200 (Utah Ct.App.1997).

¶ 13 Finally, Parents argue that the juvenile court's gag order is an unconstitutional prior restraint on their right to free

---

1. Dr. Hansen also reviewed the autopsy report and the police report prior to forming her final opinion.

2. Parents' first argument is better described as an attack on the credibility of the State's witnesses. However, because the trial court is in the best position to judge witness credibility, *see State v. Friesen*, 1999 UT App 262, ¶ 10, 988 P.2d

7, Parents' argument remains a challenge to the sufficiency of the evidence, and we treat it as such. *See In re E.R.*, 2001 UT App 66,¶ 11, 21 P.3d 680; *Fisher v. Fisher*, 907 P.2d 1172, 1178 (Utah Ct.App.1995) ("The trial court is in the best position to weigh conflicting testimony, to assess credibility, and from this, to make findings of fact.")

speech. Whether a gag order violates the right to free speech presents a question of law, which we review for correctness. *See In re M.L.C.*, 933 P.2d 380, 382 (Utah 1997).

## ANALYSIS

### I. Findings of Fact

¶ 14 Parents first argue that the evidence presented was insufficient to support the trial court's finding that K.M. suffered non-accidental trauma prior to her death. Normally, we examine a trial court's findings for clear error, *see In re E.D.*, 876 P.2d at 402; however, when an appellant challenges the sufficiency of the evidence supporting a court's findings of fact, we require them to first "marshall [sic] the evidence in support of the findings and then demonstrate that despite this evidence, the court's findings are so lacking in support as to be against the clear weight of the evidence." *In re D.G.*, 938 P.2d 298, 301 (Utah Ct.App.1997) (alteration in original) (citations omitted). To successfully discharge their duty to marshal, appellant must "present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which supports the very findings the appellant resists." *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1315 (Utah Ct.App.1991).

¶ 15 However, rather than marshaling the evidence, many appellants merely present carefully selected facts and trial testimony in support of their own position, conveniently omitting the facts relied upon by the trial court. *See e.g.*, *State v. Decorso*, 1999 UT 57,¶ 41, 993 P.2d 837 (rejecting defendant's argument because defendant "merely argued selected portions of the evidence which he believ[ed] support[ed] his own position"). When an appellant fails to properly discharge his duty to marshal, we assume that "the evidence introduced at trial ade-

quately supported the findings," and, accordingly, affirm the findings as written. *Young v. Young*, 1999 UT 38,¶ 34, 979 P.2d 338 (Utah 1999).

¶ 16 Here, Parents' marshaling is limited to nine numbered sentences, each of which is carefully selected to support Parents' argument. Among the material facts Parents have failed to present "'in comprehensive and fastidious order,'" *Moon v. Moon*, 1999 UT App 12,¶ 24, 973 P.2d 431 (citation omitted), are the effective testimonies of the nurses who prepared K.M.'s body following the declaration of death, as well as the testimonies of both Jeanlee Carver and Doctor Karen Hansen. Instead, Parents merely rehash the testimonies of Doctor Friedlander and detective Lucas, testimony that the juvenile court specifically found not to be credible. Accordingly, based on Parents failure to properly discharge their duty to marshal, we assume that the evidence supports the juvenile court's findings.[3]

### II. Conclusions of Law and the Dispositional Order

¶ 17 Parents next argue that due to the trial court's failure to expressly "determine the truthfulness of the implied allegation that [Parents] had contributed to K.M.'s condition," the court's conclusions are therefore legally inadequate and contrary to Utah law. Under Utah Law, a child who has been the victim of non-accidental physical harm, sexual exploitation, or sexual abuse is an abused child. *See* Utah Code Ann. § 78–3a–103(1)(i)(ii) (Supp.2000). "In determining whether a minor is an abused child [a court] ... may presume[ ] that the person [or persons] having the minor under his direct and exclusive care and control at the time of the abuse is responsible for the abuse." *Id.* § 78–3a–305.1 (Supp.2000). Additionally, a child, such as L.M., is considered to be ne-

3. On appeal, Parents have proffered evidence that is clearly not a part of the trial record. Our policy has long been, and continues to be, we "will not consider new evidence on appeal." *Otteson v. Department of Human Serv.*, 945 P.2d 170, 171 (Utah Ct.App.1997). Thus, Parents' "new" evidence has no impact on this appeal. Moreover, our conclusions concerning Parents' appeal are not material to any pending or future motion to consider this "new" evidence, filed in

the juvenile court. *See, e.g.*, *Gildea v. Guardian Title Co.*, 31 P.3d 543, 2001 UT 75,¶ 9, 428 Utah Adv. Rep. 21 (Stating that under normal circumstances, trial courts are bound by issues resolved on appeal, however, when faced with certain exceptional circumstances, including the discovery of new material evidence, our rules permit trial courts to reconsider those issues on remand.).

glected when "another minor in the same home is a neglected or abused child." *Id.* § 78–3a–103(1)(r)(i)(D).

¶ 18 In the present matter, because Parents have failed to marshal the evidence, we accept the juvenile court's findings of fact. In the findings, the juvenile court determined that K.M.'s injuries were the result of non-accidental physical or sexual abuse. The court therefore concluded that K.M. was an abused child as defined by Utah Code Ann. § 78–3a–103(1)(a). The court supported this conclusion utilizing a detailed time line, as well as references to relevant testimony the court expressly found to be credible. After examining the record, we conclude that the juvenile court's findings clearly support the court's conclusion; accordingly, the juvenile court correctly concluded that K.M. was an abused child.[4] Additionally, as a matter of law, because K.M. was an abused child living in the same home, pursuant to Utah Code Ann. § 78–3a–103(1)(r)(i)(D), the court correctly determined that L.M. was a neglected child.

¶ 19 Next, we address Parents' argument that the disposition order is not supported by the court's findings and conclusions, and therefore, is contrary to Utah law.[5] "The juvenile court may enter an order of permanent custody and guardianship with [the] relative ... of a minor where the court has previously acquired jurisdiction as a result of an adjudication of abuse, neglect, or dependency." Utah Code Ann. § 78–3a–118(2)(y)(i) (Supp.2000).[6] Once a court has determined that a child has been abused or neglected, that court is given broad discretion in determining the child's permanent placement. *See, e.g., J.M.V.,* 958 P.2d at 947. We will not reverse a court's discretionary

ruling so long as " 'it is consistent with the standards [we have] set ... and [it is] supported by adequate findings of fact and conclusions of law.' " *Id.* (quoting *Duncan v. Howard,* 918 P.2d 888, 891 (Utah Ct.App. 1996)).

¶ 20 Here, following the court's determination that L.M. was a neglected child, the juvenile court ordered her placed in the permanent custody of her maternal grandparents. Such an action is specifically anticipated under Utah law, *see* Utah Code Ann. § 78–3a–118(2)(y)(i), and, considering the specific circumstances of this case, the juvenile court clearly acted within its discretionary boundaries. Accordingly, we affirm the order permanently placing L.M. with her maternal grandparents.

### III. The Gag Order

¶ 21 Parents' final argument is that the gag order imposed by the juvenile court operates as a "prior restraint" in violation of the First Amendment of the United States Constitution.[7] Utah Code Ann. § 78–3a–312(3)(b) (Supp.2000) grants the juvenile court discretionary authority to "enter any additional order that it determines to be in the best interest of the child." *Id.* However, "[t]he First Amendment provides that 'Congress shall make no law ... abridging the freedom ... of the press,' and it is 'no longer open to doubt that the liberty of the press and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action.' " *Nebraska Press Ass'n. v. Stuart,* 427 U.S. 539, 556, 96 S.Ct. 2791, 2801, 49 L.Ed.2d 683 (1976) (quoting *Near v.*

---

4. Moreover, contrary to Parents' assertion, the findings also clearly indicate that K.M. was under Parents' direct and exclusive care when the abuse occurred; therefore, as a matter of law, the juvenile court could correctly presume Parents were responsible for K.M.'s abuse. *See* Utah Code Ann. § 78–3a–305.1.

5. Parents complain only that the permanency order is contrary to Utah law, leaving that portion of the order concerning supervised visitation unchallenged. Therefore, we focus our analysis on the permanency order.

6. Parents also do not challenge the juvenile court's jurisdiction over this matter.

7. Parents actually argue only that the order operates as a "prior restraint" without reference to either the United States Constitution or the Utah Constitution. Because Parents present no argument specific to the Utah Constitution, we focus our analysis solely on the United States Constitution. *See Salt Lake City v. Davidson,* 2000 UT App 12, ¶ 9 n. 4, 994 P.2d 1283 (holding that an appellant's failure to differentiate constitutional arguments results in our considering the claim only under the United States Constitution).

*Minnesota,* 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)).

¶ 22 The United States Supreme Court has concluded that these safeguards "afford special protection against orders that prohibit the publication or broadcast of particular information or commentary—orders that impose a 'previous' or 'prior' restraint on speech." *Id.* "All speech-restricting injunctions are prior restraints in the literal sense of ' "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." ' " *Lawson v. Murray,* 515 U.S. 1110, 1113, 115 S.Ct. 2264, 2266, 132 L.Ed.2d 269 (1995) (Scalia, J. concurring) (citations omitted). Moreover, while "[p]rior restraints are not unconstitutional *per se,*" any judicial order that effectuates a prior restraint bears " 'a heavy presumption against its constitutional validity.' " *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (emphasis added) (citation omitted); *see also New York Times v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (Douglas, J. concurring) (*The Pentagon Papers* ).

¶ 23 "The Government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.' " *The Pentagon Papers,* 403 U.S. at 714, 91 S.Ct. at 2144 (Douglas, J. concurring) (citation omitted). Any attempt to effect a prior restraint is subject to exacting scrutiny. *See Smith v.*

*Daily Mail Publ'g Co.,* 443 U.S. 97, 102, 99 S.Ct. 2667, 2670, 61 L.Ed.2d 399 (1979). Or, as stated in *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978),

> [p]roperly applied, the [application of exacting scrutiny] requires a court to make its own inquiry into the imminence and magnitude of the danger ... and then to balance the character of the evil ... against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.

*Id.* 435 U.S. at 842–43, 98 S.Ct. at 1542.[8]

¶ 24 As a threshold matter, we must first determine whether the juvenile court's gag order acts as a prior restraint. Because the order forbids certain communications in advance of the time that such communications are to occur, *see Lawson,* 515 U.S. at 1113, 115 S.Ct. at 2266, we conclude that the gag order does indeed act as a prior restraint on speech. Therefore, we now must identify, and then examine, the parties' conflicting interests to determine whether the gag order was properly issued.

¶ 25 Parents argue that the order is, at a minimum, overly broad and improperly infringes on their First Amendment rights to free speech. "The [F]irst [A]mendment was intended to promulgate free discussion of governmental affairs," *In re N.H.B.,* 769 P.2d 844, 847 (Utah Ct.App.1989);[9] *see also Mills v. Alabama,* 384 U.S. 214, 218–19, 86

8. Stated differently, exacting scrutiny demands that we undertake "a more delicate calculus that carefully weighs the conflicting interests to determine which demands the greater protection under the particular circumstances presented." *Smith v. Daily Mail Publ'g Co.,* 443 U.S. at 106, 99 S.Ct. at 2672 (Rehnquist, J., concurring).

9. As succinctly stated by the Supreme Court, the First Amendment

> is aimed at protecting not only speakers and writers but also listeners and readers. The essence of our form of governing was at the heart of Mr. Justice Black's reminder in the Pentagon Papers case that the press was protected so that it could bare the secrets of government and inform the people. Similarly, Senator Sam Ervin has observed: "When the people do not know what their government is doing, those who govern are not accountable for their actions—and accountability is basic to

the democratic system. By using devices of secrecy, the government attains the power to 'manage' the news and through it to manipulate public opinion." ... If government is to be truly of, by, and for the people, the people must know in detail the activities of government. Nothing so diminishes democracy as secrecy.

*Gravel v. United States,* 408 U.S. 606, 640–41, 92 S.Ct. 2614, 2633, 33 L.Ed.2d 583 (1972) (internal citations and quotations omitted) (footnotes omitted); *see also The Pentagon Papers,* 403 U.S. at 723–24, 91 S.Ct. at 2146 (Douglas, J. concurring) ("'The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information.... Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors. Open debate and discussion of public issues are vital to our national health. On public questions there should be 'uninhibited, robust, and wide-open' debate." (Citation omitted.)).

S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966) (included among the major purposes of the First Amendment is protecting "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes"), and, among other things, comments centered on a judicial proceeding " 'enhance[ ] the quality and safeguard[ ] the integrity of the fact-finding process, with benefits to ... society as a whole.' " *N.H.B.*, 769 P.2d at 846 (quoting *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 606, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982)).[10]

▆▆▆▆ ¶ 26 The First Amendment provides an umbrella of protection to " 'every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them.' " *Wood v. Georgia*, 370 U.S. 375, 392, 82 S.Ct. 1364, 1374, 8 L.Ed.2d 569 (1962) (citation omitted). Therefore, to justify any infringement on First Amendment protections, the State must present evidence of a compelling interest that will be endangered absent some limitation on speech. *See Landmark*, 435 U.S. at 842–43, 98 S.Ct. 1543. Then, on balance, if the court determines that this interest is deserving of protection, any resulting "limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974).

¶ 27 The State argues "[t]he juvenile court sought to protect [L.M.] from becoming a pawn of the media," and suggests that we follow the analysis of the Illinois Court of Appeals in affirming the juvenile court's gag order. *See In re J.S.*, 267 Ill.App.3d 145, 204 Ill.Dec. 30, 640 N.E.2d 1379, 1380–83 (1994).[11] We agree that "the state has a compelling interest in maintaining the confidentiality of juvenile court proceedings," *N.H.B.*, 769 P.2d at 849, and that such confidentiality normally serves the best interest of all children involved in juvenile court proceedings. However, we can discern no evidence in the record that the juvenile court properly discharged its duty to; (1) clearly identify "the imminence and magnitude of the [possible] danger," *Landmark Communications*, 435 U.S. at 843, 98 S.Ct. at 1543; (2) balance the parties' interests to determine whose interest deserved the greater protection; and (3) if the court determined that the State's interests in protecting L.M. deserved the greater protection, to either (a) explore other possible measures, or (b) narrowly draft the gag order to ensure that it was no more restrictive than necessary to protect the compelling interests. *See id.; see also Procunier*, 416 U.S. at 413, 94 S.Ct. at 1811.[12]

10.  The extreme importance public discussion of governmental affairs is given mandates that neither the State's interests in protecting a judge's reputation nor its interests in "maintaining the institutional integrity" of the courts is sufficient to justify any limitation on speech. *See Landmark*, 435 U.S. at 841, 98 S.Ct. at 1543.

11.  In *J.S.*, the appellant brought an interlocutory appeal seeking to vacate a gag order issued by the juvenile court. *See In re J.S.*, 267 Ill.App.3d 145, 204 Ill.Dec. 30, 640 N.E.2d 1379, 1380 (1994). The gag order had been issued in the course of an unpleasant custody dispute featuring claims that the child had been sexually abused. *See id.* at 1381. In reviewing the order, the Illinois court examined whether the scope of the order was " 'necessary to obviate a "serious and imminent" threat of impending harm, which ... cannot adequately be addressed by other, less speech-restrictive means.' " *Id.* at 1382 (citation omitted). Following a detailed discussion of Illinois case law, the court determined that J.S.'s mother had failed to demonstrate "the *necessity* of discussing the details of this case with the news media.... [W]e find that J.S.'s rights to privacy and to be free from further emotional trauma outweigh the mother's right to take her case to the press." *Id.* at 1383. The court predicated this conclusion, in part, on their finding that J.S. was an innocent, third-party child victim drawn into the conflict by the actions of the parties. *See id.* at 1382. The court also determined that the circumstance created a compelling interest in preserving J.S.'s "right to be free from invasions [into his] privacy." *Id.*

12.  [T]he First Amendment tolerates absolutely no prior judicial restraints ... predicated upon [the] *surmise or conjecture* that untoward consequences *may* result.... [O]nly governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence [of the danger identified] can support even the issuance of an interim restraining order. In no event may mere conclusions be sufficient. *The Pentagon Papers*, 403 U.S. at 725–27, 91 S.Ct. 2147 (Brennan, J. concurring) (emphasis added).

¶ 28 Therefore, we remand this issue to the juvenile court with instructions to conduct the proper inquiry. Should the State present sufficient information to justify the issuance of the gag order, the juvenile court must then insure that it is narrowly drafted.

## CONCLUSION

¶ 29 We affirm the juvenile court's findings of fact, conclusions of law, and that portion of the dispositional order permanently placing L.M. with her maternal grandparents. However, we vacate the juvenile court's gag order so that the court on remand may conduct a proper inquiry into the government's interests and balance the imminence and magnitude of the danger presented against Parents' right to free and unfettered expression.

¶ 30 I CONCUR: JUDITH M. BILLINGS, Judge.

ORME, Judge (concurring in part and concurring in the result in part):

¶ 31 I concur in part III of the court's opinion. I also concur in the result reached in parts I and II. However, I disagree that appellants failed to meet their marshaling burden. In addition to the nine numbered sentences expressly relied on in challenging the key findings—which sentences include specific references to the testimony of Dr. Hansen and Nurse Carver—appellants set forth nearly seventy numbered sentences in the fact section of their brief, each with a citation to the record or supporting documentation. Some of these sentences admittedly stray from pure marshaling of the evidence *in support* of the findings and instead refer to evidence which does not support the findings and, indeed, even evidence which is not in the record before us. All things considered, however, I believe appellants have adequately marshaled the evidence and fairly put in issue the question of whether the key findings are supported by the evidence.

¶ 32 Of course, the question for us is not whether the evidence would support other findings; the question is whether the findings that were made have adequate support in the evidence. The evidence concerning the origin of the child's injuries was very much in dispute and simply could not be

reconciled. Some of the evidence would definitely support findings that would exonerate the parents. Other evidence very much incriminates them. It was the incriminating evidence that the trial court accepted. We are in no position to second-guess its underlying credibility determinations. Given those determinations, there is adequate evidence to support the trial court's findings, and thus I agree our appropriate starting point in this case is the findings. Given those findings, the court's legal conclusions are correct, and its disposition is within the broad range of its discretion, as the main opinion holds.

¶ 33 I do wish to make one additional observation. The documentation referred to in footnote 3 of the main opinion seriously undercuts the findings made and the disposition reached. It includes a letter from the Deputy Chief Medical Examiner agreeing with another expert that the injuries, while of mysterious origin, were more consistent with severe diaper rash than inflicted trauma. That letter, and the other items improperly included in an addendum to appellant's brief, were submitted months after the trial court entered its judgment in this case. They are simply not part of the record before us. However, it should be noted that the strictures of procedural rules do not rigidly limit the ability of the trial court to reconsider this case in light of such evidence. *See, e.g., In re J.P.,* 921 P.2d 1012, 1016–17 (Utah Ct.App. 1996), *cert. denied,* 931 P.2d 146 (Utah 1997); *In re J.J.T.,* 877 P.2d 161, 163–64 (Utah Ct.App.1994).

> [T]o effectively determine the best interests of a child, the juvenile court needs continuing jurisdiction, and thus must be "free from the imposition of artificial constraints that serve merely to advance the cause of judicial economy." This principle, coupled with the equitable nature of juvenile court proceedings, supports a less stringent notion of finality.

*J.P.,* 921 P.2d at 1016 (quoting *J.J.T.,* 877 P.2d at 164). If, as appears likely, the new evidence suggests that the trial court's conclusions and disposition must, in fairness, be reconsidered, then such reconsideration should occur. However, the forum where

such reconsideration should initially take place is in the trial court, not this court.