2013 UT App 190

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF L.M. AND L.M., PERSONS
UNDER EIGHTEEN YEARS OF AGE.

M.V-L.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20120556-CA
Filed August 1, 2013

Third District Juvenile, Salt Lake Department
The Honorable Charles D. Behrens
No. 1027720

Colleen K. Coebergh, Attorney for Appellant
John E. Swallow and John M. Peterson, Attorneys
for Appellee
Martha Pierce, Guardian ad Litem

JUDGE JAMES Z. DAVIS authored this Opinion, in which JUDGES
GREGORY K. ORME and CAROLYN B. MCHUGH concurred.

DAVIS, Judge:

¶1     M.V-L. (Father) appeals the juvenile court's ruling terminating his parental rights to his two daughters, L.M. (Older Sister) and L.M. (Younger Sister). We affirm the juvenile court's ruling.

BACKGROUND

¶2     Father, the non-custodial parent of the two girls, maintained a friendly co-parenting relationship with the girls' custodial parent (Mother).[1] The incidents leading up to the termination of Father's parental rights began in 2009, after Mother and her paramour, M.A., were arrested on outstanding warrants. The Division of Child and Family Services (DCFS) and the juvenile court became involved at that time, and the court ordered Protective Supervision Services over Older Sister, Younger Sister, and Mother's two other children.[2]

¶3     In April 2010, Father moved in with Mother and the children and stayed with them for eight or nine months, during which time he watched the children and participated in the peer parenting classes that Mother was required to take.[3] Father was aware that Mother's relationship with M.A. was part of the reason DCFS and the courts were involved and was also aware that M.A. abused Mother. Mother was eventually deemed to be in substantial

---

1. "We recite the facts in a light most favorable to the juvenile court findings." *In re L.M.*, 2001 UT App 314, ¶ 2, 37 P.3d 1188.

2. Mother gave birth to a son (Son), fathered by M.A. in 2010. M.A. voluntarily relinquished his parental rights to Son. Mother has another daughter, Half Sister, who has a different father than Son, Older Sister, and Younger Sister. In addition, prior to the 2009 proceedings, Mother had relinquished her parental rights to four other children.

3. Older Sister and Younger Sister were found to be dependent as to Father, and no reunification services were ordered as to him. *See generally* Utah Code Ann. § 78A-6-105(11) (LexisNexis 2012) ("'Dependent child' includes a child who is homeless or without proper care through no fault of the child's parent, guardian, or custodian.").

compliance with her reunification plan, and the DCFS case was closed in December 2010.

¶4    The State became involved again in October 2011 after two particularly severe incidents of domestic violence in which M.A. held a knife to Mother's throat, threatened to kill her with a baseball bat, dragged her by her hair, kicked and punched her, and attempted to strangle her. One of these incidents was witnessed by Son and a cousin, and the other by all four of Mother's children.

¶5    This time, the State elected to proceed directly to the termination of parental rights as to both Mother and Father, without offering further reunification services in light of the services offered to Mother in 2009. The four children were placed in the same foster care home, and a five-day termination trial was held in March 2012.

¶6    At the termination trial, Mother testified that she kept Father apprised of "everything" going on with the girls, including her 2009 involvement with DCFS and her abusive relationship with M.A. Mother assured Father that his children were not aware of the domestic violence going on in the home, explaining that she made sure her interactions with M.A. occurred in the garage, where they supposedly could not be heard when the children were in the home.

¶7    Father testified that he was aware that M.A., a violent gang member, had essentially been "stalking" Mother and would beat her and steal and damage her property, but that the children were not harmed by M.A.'s actions because they did not directly witness them. Father testified that he encouraged Mother to report the domestic violence to the police or DCFS, but that he did not do so himself, considering it a futile endeavor because M.A. could not be caught in the act.

¶8     Both Mother and Father also testified that the children were not being properly cared for in their foster placement. Of primary concern were the "sexually reactive behaviors" that Half Sister and Older Sister began exhibiting in the foster home. These behaviors included inappropriately exposing themselves and touching the other children in the foster home.[4] The children had disclosed to the foster mother and a therapist that M.A. had molested Older Sister and Half Sister and was physically abusive to Son, an infant at the time. Mother was not aware that M.A. had abused her children. When the sexually reactive behavior began, the foster mother contacted DCFS and attempted to work out a plan to keep all of the children safe while also keeping Mother's children together. Ultimately, Half Sister had to be removed from the home until her sexually reactive behavior could be addressed.

¶9     The juvenile court ultimately terminated Father's parental rights, concluding that Father was an unfit parent and neglected his children. Specifically, the juvenile court found that he was neglectful based on his failure to take any steps to protect his children from the domestic violence that he knew was occurring in their home. Father appeals.[5]

## ISSUES AND STANDARD OF REVIEW

¶10    Father challenges the sufficiency of the evidence supporting the juvenile court's determinations that he is an unfit parent, that he neglected his children, and that it is in the children's best

---

4. In addition to Mother's four children, there were four other children in the foster home ranging from five years old to eighteen years old.

5. Mother appeals separately. *In re L.M.*, 2013 UT App 191, 308 P.3d 553.

interests for his parental rights to be terminated.[6] "[O]n appeal [f]indings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous." *In re D.G.*, 938 P.2d 298, 301 (Utah Ct. App. 1997) (second alteration in original) (citation and internal quotation marks omitted); *accord In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435.

ANALYSIS

¶11    Father argues that the juvenile court's finding that he failed to take any action to protect his children from M.A.—i.e., that he failed to call the police, file for a protective order, or contact DCFS—is insufficient to support the termination of his parental rights. Father contends that the actions enumerated by the juvenile court "would [not] have ensured the protection and safety of his children from the risks and harms of being exposed to domestic violence presented to them," particularly because the police were already aware of the situation, Mother had assured him that the

---

6. Father did not request that the State be ordered to provide him with reunification services, and to the extent he challenges on appeal the propriety of having his parental rights terminated without having received such services, he did not raise the issue until oral argument before this court. We accordingly do not address this issue. *See State v. Dunn*, 850 P.2d 1201, 1220 n.17 (Utah 1993) (explaining that a claim made at oral argument, but not raised in the party's appellate briefing, is deemed waived); *see also* Utah Code Ann. § 78A-6-312 (LexisNexis 2012) (listing guidelines to be considered by a court deciding whether reunification services are appropriate); *id.* § 78A-6-312(20) (noting that "a parent's interest in receiving reunification services is limited"); *In re S.O.*, 2005 UT App 393, ¶ 11, 122 P.3d 686 (mem.) (per curiam) ("Reunification services are a gratuity provided to parents by the Legislature, and appellants thus have no constitutional right to receive these services." (citation and internal quotation marks omitted)).

children could not hear the violence being perpetrated through the garage walls, and the children had not disclosed to Father that they knew of the domestic violence. Therefore, he contends, he "violated no legal duties" by opting against pursuing such futile protective measures. Father also asserts that he and the children shared a loving and bonded relationship and that the children were "subject to gross neglect in the foster home due to obvious risks of ongoing sexually reactive behaviors being ignored and perpetuated."[7]

## I. Grounds

¶12     The Utah Code authorizes the juvenile court to "terminate all parental rights with respect to a parent if the court finds any one of the following: . . . (b) that the parent has neglected or abused the child; (c) that the parent is unfit or incompetent . . . ." Utah Code Ann. § 78A-6-507(1)(b), (c) (LexisNexis 2012). The juvenile court may also terminate parental rights if "only token efforts have been made by the parent: . . . (ii) to prevent neglect of the child; (iii) to eliminate the risk of serious harm to the child; or (iv) to avoid being an unfit parent." *Id.* § 78A-6-507(1)(f)(ii)–(iv). "Neglect" includes "action or inaction causing . . . failure or refusal of a parent, guardian, or custodian to provide proper or necessary subsistence, education, or medical care, or any other care necessary for the child's health, safety, morals, or well-being." *Id.* § 78A-6-105(27)(a)(iii). The juvenile court must also "consider the welfare and best interest of the child . . . in determining whether termination of parental rights shall be ordered." *Id.* § 78A-6-503(12).

---

7. Father also asserts that his rights to "a fundamentally fair process" were violated because his first language is Spanish and DCFS never provided him with a Spanish interpreter. Because this argument is not adequately briefed, we do not address it. *See* Utah R. App. P. 24(a)(9) (outlining the appellate briefing requirements for an argument); *Jacob v. Cross*, 2012 UT App 190, ¶ 2, 283 P.3d 539 (per curiam) ("If an appellant fails to adequately brief an issue on appeal, the appellate court may decline to consider the argument.").

¶13    Here, the juvenile court based its decision to terminate Father's parental rights on evidence that Father was aware that M.A. was abusing Mother in the children's home and that this "domestic violence was a significant factor in the [2012] removal of his children" and in DCFS's involvement in 2009. Contrary to Father's assertions, the juvenile court found that Father "was aware that [his children] had been exposed to domestic violence" and did not take any steps to protect the children, such as calling the police or DCFS, or filing for an adult or child protective order. The juvenile court declined to make any "findings regarding the sexual abuse" allegations, determining that Father's "unwillingness or inability to provide for the children is based upon his prior" and ongoing "unwillingness to protect or prevent the children from the domestic violence."

¶14    We agree with the juvenile court. Father's arguments as to the futility of the protective actions suggested by the juvenile court do not exonerate him from his duty to protect his children from the violence occurring in their home. Likewise, even if the children could not hear the abuse through the garage walls, that does not necessarily prove that they were otherwise unaware that it was occurring. Indeed, according to Mother's testimony, all of the children had witnessed at least one of M.A.'s attacks, and according to Father's testimony, Mother was often visibly bruised. However, the children do not need to have witnessed the violence firsthand to be aware that it was taking place and to be psychologically harmed by it. *See generally* Brooke Kintner, Note, *The "Other" Victims: Can We Hold Parents Liable for Failing to Protect Their Children from Harms of Domestic Violence?*, 31 New Eng. J. on Crim. & Civ. Confinement 271, 272 (2005) (describing studies that indicate "that despite victims' attempts to conceal domestic violence in the home, children actually witness or are at least aware of nearly all battering episodes," and that "[w]itnessing domestic violence affects children in a similar manner as direct abuse" (citations and internal quotation marks omitted)). Further, that the children did not tell Father about the domestic violence could indicate that they were not close to Father or had other reasons not

to share this information with him, just as easily as it could indicate, as Father argues, that they did not know it was occurring. Ultimately, the very fact that Mother was unable to keep M.A. out of her home to protect herself should have been enough to prompt Father to take action to protect his children, regardless of the children's knowledge of the abuse. *Cf. In re V.L.*, 2008 UT App 88, ¶ 23, 182 P.3d 395 (listing as one factor supporting the termination of the father's parental rights his "fail[ure] to take any steps to prevent the children from remaining in" a home in which he knew there was domestic violence).

¶15    Father attempts to undermine the import of his inaction by focusing on other measures of his parenting ability, i.e., by pointing out that his "parenting was not found to fall below any cognizable legal standard in 2009" and that he pays child support, buys the children clothes, spends time with his children, talks to them regularly on the telephone, and otherwise has positive, loving relationships with his children, as well as with Son and Half Sister. Father also notes that he had made one offer to take the children and conducted a brief and fruitless search for more suitable housing to facilitate their moving in with him. Father's positive relationship and other strengths as a parent, as well as his fleeting efforts to have the children move in with him, however, do not outweigh the severity of his overall failure to act. The knowledge that a violent gang member with a lengthy criminal record, whom Father described as adept at eluding authorities, was regularly breaking into the home in which his children lived and assaulting their mother should have prompted any reasonable parent to take actions that would ensure the safety and best interests of his or her children. Father was also aware that during at least one of these incidents, M.A. threatened Mother with a knife. Allowing children to continue living under these conditions based primarily on the belief that they will remain blind to and unharmed by reality if they "hear no evil" and "see no evil" decidedly does not ensure the children's safety. Accordingly, the juvenile court had sufficient evidence to determine that Father neglected his children. *Cf. In re T.M.*, 2006 UT App 435, ¶ 21, 147 P.3d 529 (noting that the appellate

courts "must forebear disturbing the 'close call'" because "the juvenile court, with its training, expertise, and superior ability to assess the credibility of parties and witnesses, . . . is in the best position to make such a difficult determination" (citations and internal quotation marks omitted)).[8]

## II. Best Interests

¶16    Next, in determining the best interests of Older Sister and Younger Sister, the juvenile court noted that "[t]he children are in need of stability and protection from abuse and neglect" and that Older Sister and Younger Sister "have been residing in a legal risk placement where their needs have been met," and in the same foster home as Son, their half brother. The foster family has been providing the children with the necessary medical, dental, emotional, and psychological care, whereas when the children were first placed in State custody, Father indicated that were he not living with his cousin at the time, he would be willing to take custody of Half Sister and Older Sister, but not, in the State's words, "the medically fragile [Younger Sister], his biological

---

8. We recognize that this was a close case because, as the State put it, Father is "an atypical father compared to most facing termination. He did not use drugs, he was consistently employed throughout the proceedings, never abused his children, and consistently maintained contact with them," as well as with Son and Half Sister. *Cf. In re T.M.*, 2006 UT App 435, ¶ 21, 147 P.3d 529 (affirming the termination of a father's parental rights where "the [juvenile] court weighed evidence of Father's history of poor choices that negatively impacted the Children's lives, the stability and love the Children's foster home provided, and the Children's close bond with their foster family, against evidence of Father's efforts to complete his treatment plan, his commitment to provide for the Children, his employed and drug-free status, and the mutual love and bond between Father and the Children").

daughter." Further, the foster parents are willing to adopt the children and "have been approved by DCFS as an adoptive home."

¶17 Father attempts to turn on its head the context of the sexually reactive behavior exhibited by Half Sister and Older Sister in the foster home, describing the foster placement as "rampant" with "sexual acting out" that the foster parents knew about and ignored. Father ignores the evidence supporting the allegation that Older Sister had been sexually abused by M.A. and that the sexually reactive behavior she exhibited in the foster placement was possibly a manifestation of the psychological trauma caused by the alleged abuse. We agree with the State that, if anything, "the children's physical and emotional condition when they came in to foster care is actually further evidence of parental neglect" and, we would add, further evidence that termination of Father's parental rights is in the children's best interests. Accordingly, sufficient evidence supported the juvenile court's determination that it is in the children's best interests to terminate Father's parental rights and allow the children "to be adopted by [the foster] parents into a home where they will be secure, stable, loved, and protected from neglect and abuse."

CONCLUSION

¶18 Sufficient evidence supports the juvenile court's findings that Father was neglectful and that termination of his parental rights was in the children's best interests. Accordingly, we affirm the juvenile court's termination of Father's parental rights.

––––––––––